CKB & ASSOCIATES, INC. and
Charles E. Redwine, Appellants,

v.

MOORE McCORMACK PETROLEUM,
INC., Appellee.

No. 05–90–00289–CV.

Court of Appeals of Texas,
Dallas.

April 23, 1991.

Rehearing Denied June 5, 1991.

**578**

William J. Burnett, Arthur Mitchell, Dallas (on appeal only), for appellants.

Rebecca P. Adams, James A. Ellis and Craig Weinlein, Dallas, for appellee.

Before STEWART, OVARD and BURNETT, JJ.

## OPINION ON REHEARING

OVARD, Justice.

On Motion for Rehearing, our December 19, 1990 opinion is withdrawn. This is now the opinion of the court:

This is a summary judgment case. It is also the continuation of a nine-year dispute over an oil refining agreement. On January 8, 1990, the trial court entered final summary judgment for Moore McCormack Petroleum (MMP) on its breach of contract claim and awarded damages of $7,190,-125.80, reduced by credits and offsets totalling $6,251,060.88. The trial court ordered CKB & Associates, Inc. (CKB) to pay a balance of $939,064.60, plus interest and attorneys' fees. CKB and MMP both appeal from the trial court's judgment. CKB argues that it did not breach its contract with MMP, that if it did breach the contract fact issues exist as to the proper measure of damages, and that the trial court used an erroneous legal standard in determining damages. MMP complains that CKB is not entitled to offsets against its claim and that the trial court erred in determining the proper amount of prejudgment interest to which MMP is entitled. MMP also contests each of CKB's points of error. We affirm the summary judgment on the question of CKB's liability for breach of contract. On the issue of damages, we modify the judgment of the trial court according to the analysis contained herein and affirm it. We also modify the trial court's award of prejudgment interest.

### Facts and Procedural History

MMP sells refined petroleum products. In 1981, CKB bought a financially troubled oil refinery in Okmulgee, Oklahoma. With MMP's consent, CKB accepted assignment of a petroleum processing contract between MMP and the bankrupt refiner. By accepting the assignment, CKB agreed to refine for a ninety-day period 15,000 barrels per day of Oklahoma sweet crude supplied by MMP. The contract required CKB "to use its best efforts to process the crude oil into the volumes of refined products reflected on Exhibit "A," with variations not to exceed plus or minus one percent (1%) from the volumes reflected on Exhibit "A" for each product and from the total volume." [1]

Exhibit "A" established the following targets for the refined products based on 15,000 barrels of crude:

| | | |
|---|---|---|
| LPG (liquified petroleum gas) | 507 | Barrels per day |
| Gasoline | 6,128 | |
| JP–4 Jet Fuel | 3,500 | |
| TF–Kerosene | 1,000 | |
| No. 2 Distillate | 3,105 | |
| No. 6 Fuel Oil | 270 | |
| Flux | 1,050 | |
| Total | 15,560 | |

---

1. Exhibit "A" was a page attached to the back of the petroleum processing agreement. Exhibit "A" illustrated the production targets for each of seven refined fuels based upon a daily delivery of 15,000 barrels per day of crude oil.

The total exceeds 15,000 barrels because the refined products occupy a slightly greater volume than the original crude. MMP contracted to pay CKB a refining fee of $2.50 per barrel of crude.

The agreement imposed additional obligations on CKB. The company agreed to use its "best efforts" to help MMP market the production of JP–4 jet fuel. CKB also agreed to post letters of credit totalling $4 million to secure its performance under the contract.

CKB began processing crude oil under the contract in September 1981. Problems arose quickly. The Okmulgee refinery processed all of MMP's oil, but the volumes of refined products did not correspond to the schedule on Exhibit "A." Yields of JP–4 jet fuel (a high-priced product), LPG, and flux fell below the contracted target. Production of No. 6 fuel oil (a low-priced product), gasoline, kerosene, and No. 2 distillate exceeded contract quantities. On October 16, 1981, approximately one month into the production run, William Wicker, MMP's vice-president and general manager, noti-

fied CKB by letter that deliveries deviated from the contract targets. One month later, CKB's vice-president, Bill Harris, replied by letter that CKB did not believe the contract required it to hit any particular yield targets as long as CKB exercised "its good faith best efforts." MMP responded on November 18, 1981. Wicker complained that total volume delivered in October fell below the contract target and that again the refinery over-produced No. 6 fuel oil and flux and under-produced LPG and JP–4 jet fuel.[2] The letter warned CKB of liability if it failed to adjust the refinery yield. Wicker wrote twice more. The second letter, dated December 1, 1981, again complained of volume shortfalls and again warned that at the end of the contract period (December 20, 1981) CKB would have to make a financial adjustment "for the deficiency for product not received by MMP."

During the ninety-day contract period, CKB refined 1,358,273 barrels of MMP's crude oil. CKB significantly under-produced LPG, JP–4 jet fuel, and flux:

|  | 100% of Contract Yield [3] | Actual Delivery | % of Contract Yield |
|---|---|---|---|
| LPG | 45,910 | 25,540 | 55.63% |
| JP–4 | 316,930 | 172,913 | 54.56% |
| Flux | 95,079 | 62,095 | 65.31% |

CKB delivered a surplus of gasoline, kerosene, No. 2 distillate, and No. 6 fuel oil:

|  | 100% of Contract Yield | Actual Delivery | % of Contract Yield |
|---|---|---|---|
| Gasoline | 554,900 | 570,161 | 102.75% |
| Kerosene | 90,552 | 102,941 | 113.68% |
| No. 6 Fuel Oil | 24,449 | 100,358 | 410.48% |
| No. 2 Distillate | 281,163 | 329,540 | 117.21% |

Despite the wide deviations from the contract targets, MMP accepted all products tendered.

CKB filed suit on December 17, 1981, to enjoin MMP from tapping the letters of

2. We are unable to determine why MMP twice complained of over-production of flux when in fact production of flux fell 34% below the contract target. Nonetheless, the record clearly reflects that MMP complained of over-production of flux.

3. We derive 100% of contract yield merely by multiplying the Exhibit "A" daily targets for each refined product by 90 days, the length of the contract. CKB did not commit to hit 100% of contract yields, only to use its best efforts to produce the yields within a 1% tolerance above or below 100% of contract yield.

credit which secured CKB's performance. Four days later MMP presented to the bank for payment three sight drafts totalling $3,602,530. CKB and MMP negotiated a partial settlement. CKB paid MMP $942,000 and ordered the bank to honor a sight draft for $1,658,590. MMP agreed to withdraw presentment of two sight drafts totalling $1,943,940. MMP also agreed to release CKB from any claims it might have concerning the quality of products delivered. The agreement left several claims unresolved. MMP retained the right to pursue claims for deficiencies in the volumes of the products delivered. CKB believed it retained the right to sue MMP for refund of the sight draft MMP drew down. CKB asserted that it owed MMP no more than the $942,000 which it had already paid, and it sued MMP for the refund. MMP argued that the partial settlement precluded CKB from contesting MMP's right to keep the proceeds of the sight draft. The litigation reached the Texas Supreme Court, which reversed summary judgment for MMP. The Supreme Court held that a fact question existed as to the meaning of the partial settlement agreement. *CKB & Associates v. Moore McCormack Petroleum, Inc.*, 734 S.W.2d 653, 655–56 (Tex.1987).

While the letter of credit litigation proceeded through the appellate courts, MMP pursued its claims for volume deficiencies in the trial court. MMP argued that it suffered damages of $7,190,125.48 due to undershipment of JP–4 jet fuel, LPG, and flux. The JP–4 represented most of the claim. CKB contended that it owed nothing because the petroleum processing agreement required it only to use "best efforts" to hit within 1% of the contract figure. The agreement did not mandate any specific production figure. CKB also pleaded some variant of offset. (See discussion of MMP's first cross-point.) It pointed out that it had overproduced gasoline, kerosene, No. 6 fuel oil, and No. 2 distillate and that MMP accepted the benefit of the surplus. CKB argued that the court should reduce damages by the value of the surplus. CKB admitted the fair market values of the refined products in

Okmulgee, Oklahoma, on the last day for delivery under the contract. MMP accepted the values for purposes of its interlocutory summary judgment motion:

|  | $ Price per barrel |
| --- | --- |
| LPG | 16.065 |
| JP–4 Jet Fuel | 42.42 |
| Gasoline | 39.69 |
| Kerosene | 41.79 |
| No. 2 distillate | 40.95 |
| No. 6 fuel oil | 24.85 |
| Flux | 22.85 |

The trial court granted MMP's motion for interlocutory summary judgment for damages due to volume deficiencies but credited CKB for the overproduction. The trial court found damages of $7,190,125.48, reduced by $4,592,470.78 in overproduction. The trial court further reduced MMP's award by $1,658,590 to reflect the draw on the letter of credit. The offset and the paid sight draft left a balance of $939,064.60. The interlocutory summary judgment became final on January 8, 1990. The trial court entered judgment for MMP in the amount of $939,064.40, plus attorneys' fees and prejudgment interest.

CKB and MMP both appeal from the trial court's judgment. CKB raises five points of error. The points make three distinct arguments: (1) that genuine issues of fact exist as to whether CKB breached the processing agreement with respect to the volume deficiencies; (2) that genuine issues of fact exist as to the amount of damages to which MMP is entitled; and (3) that the trial court, as a matter of law, used an erroneous standard to calculate the amount of CKB's claim of offset against MMP. MMP asserts two cross-points of error: (1) that there was no summary judgment evidence on which the trial court could base the offset it awarded CKB for surplus fuel delivered; and (2) that the trial court erred in entering a final judgment that awarded MMP prejudgment interest (a) compounded annually instead of daily (b) from June 20, 1982, instead of from December 20, 1981, to the date of judgment. We affirm summary judgment on the issue of CKB's liability for breach of contract. On the questions of damages and pre-judgment inter-

est, we modify the judgment of the trial court according to the analysis below.

## Legal Analysis

### Liability

CKB reminds us that this is a summary judgment case. We can affirm a summary judgment only if the record reveals no genuine issue of material fact. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex.1979). CKB asserts that a genuine issue of material fact exists as to whether it breached the petroleum processing agreement. CKB points out that the agreement does not mandate that its production hit specific targets. It requires only that CKB use its best efforts to produce the target quantities within a tolerance of 1%. CKB also notes that the agreement requires it to use its best efforts to help MMP market the production of JP–4 jet fuel. CKB urges that the two "best efforts" provisions cannot be read as independent obligations. It argues that the obligation to use best efforts to produce the Exhibit "A" target of JP–4 depends upon the ability to help MMP sell JP–4, using best efforts. CKB maintains that the federal government is the only buyer and that therefore the market for JP–4 is limited. CKB declares that even using its best efforts it could sell or help MMP sell no more JP–4 than the 172,913 barrels it produced. CKB argues that to produce more JP–4 than could be sold is not commercially reasonable. Therefore, it used its best efforts to produce the JP–4 even though production fell 45% below the Exhibit "A" target. According to CKB, a trier of fact should decide whether its regard for the saleability of the JP–4 constituted best efforts within the meaning of the contract.

■ We disagree. CKB is not entitled to an evidentiary hearing on the proper construction of the contract. When a contract is unambiguous, the court construes the contract as a matter of law. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968); *Praeger v. Wilson*, 721 S.W.2d 597, 600 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.). In our case, neither CKB nor MMP pleaded ambiguity, and we find none. The trial court properly could construe the contract.

■ The processing agreement is not susceptible to the interpretation CKB advocates. The two "best efforts" provisions (best efforts to hit the Exhibit "A" targets, plus or minus 1%, and best efforts to help market the JP–4) appear in different sections of the contract, separated by five intervening sections and several pages. Neither "best efforts" provision refers to the other. Neither provision declares that the obligation to use best efforts related to or depended upon market conditions. In short, nothing in the contract suggests interdependency between the obligation to use best efforts to produce JP–4 according to the Exhibit "A" schedule and the obligation to use best efforts to help MMP sell whatever quantity of JP–4 is produced. We cannot rewrite the contract to make the obligations interdependent. *Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex.App.—Amarillo 1987, writ ref'd n.r.e.); *Berman v. Rife*, 644 S.W.2d 574, 576 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.). No genuine issue of material fact exists as to the interaction of the two "best efforts" provisions. Each obligation exists independently of the other.

Next, we must determine whether, based on the summary judgment evidence, the trial court could have found that CKB failed to use its best efforts to produce within 1% tolerance the volumes of refined products derived from Exhibit "A." Best efforts is a nebulous standard. Under some circumstances, a party could use best efforts to achieve a contractual goal and fall well short. Under different circumstances, an effort well short of one's best may suffice to hit a target. Contracting parties ordinarily use best efforts language when they are uncertain about what can be achieved, given their limited resources. *See generally Bloor v. Falstaff*, 601 F.2d 609 (2d Cir.1979). Nonetheless, to be enforceable, a best efforts contract must set some kind of goal or guideline against which best efforts may be measured. *See Pinnacle Books, Inc. v. Harlequin Enter-*

*prises*, 519 F.Supp. 118, 121 (S.D.N.Y.1981). A contracting party that performs within the guidelines fulfills the contract regardless of the quality of its efforts. When a party misses the guidelines, courts measure the quality of its efforts by the circumstances of the case, *Bloor*, 601 F.2d at 613–14; *Pinnacle*, 519 F.Supp. at 122, and by comparing the party's performance with that of an average, prudent, comparable operator. *See Arnold Productions, Inc. v. Favorite Films Corp.*, 176 F.Supp. 862, 866 (S.D.N.Y.1959). In our case, we have no summary judgment evidence of the performance of prudent comparable operators. However, the record reveals considerable summary judgment evidence of the circumstances surrounding CKB's performance.

That evidence establishes that CKB failed to use its best efforts to produce the volumes specified in the contract. The deposition of Gene Moore is instructive. Moore managed the Okmulgee refinery for CKB during the contract period. He explained that refineries can adjust their yields to make more of some products and less of others. He testified that he operated the refinery to produce the highest dollar yield on the crude oil refined rather than to produce the quantities specified in the contract with MMP. Moore explained that JP–4 is a high-priced product, but it has a limited market. The federal government and its suppliers are the only buyers. Moore testified that he produced a normal volume of JP–4 from MMP's crude. He thought that the normal quantity was all he could sell. Moore did not know the terms of the processing agreement between CKB and MMP. He admitted that the refinery could have doubled JP–4 production within three days, without substantially cutting production of other fuels, if CKB had so instructed him.

CKB's Dallas office never told him to increase production of JP–4. Nor did it inform him of the targets established by the processing agreement with MMP. CKB's Dallas office instructed him only to maximize the dollar yield from the crude. William David Harris was CKB's Vice President of Refinery Sales and the person responsible for selling the Okmulgee refinery's production. He testified by deposition that he failed to tell Moore to make additional JP–4, even after getting notice of the deficiency. Harris disclosed that the notification system worked in reverse. Moore told Harris the refinery yield he expected. Harris used the information in negotiating and planning sales. He did not tell Moore what to produce. In order to maximize dollar yield (his mandate as he understood it), Moore operated the refinery to produce high volumes of gasoline, kerosene, and No. 2 distillate. They were relatively high-priced fuels, and Moore believed he could sell them more readily than JP–4.

However, CKB's processing agreement with MMP did not provide that CKB maximize its dollar yield for MMP's crude. It required CKB to try to hit specified targets within 1% tolerance. The parties agree CKB did not approach the targets. The circumstances elucidated by the depositions of Harris and Moore show that CKB failed to try. Their testimony shows that, despite the existence of the processing agreement, CKB ran its refinery as though it were selling the refined products on the open market rather than processing crude on a fee-for-service basis for another seller. The summary judgment record reveals no evidence that contradicts the essential points of their testimony. CKB used its best efforts to maximize the yield of high-priced products, which it believed saleable.[4] It made no efforts to produce the quantities specified in its contract with MMP. As a matter of law, no efforts cannot be best efforts. *See Bloor*, 601 F.2d at 613–14. We conclude that no genuine issue of material fact exists as to whether CKB breached its obligation to use best efforts. We overrule the points of error which assert that such a fact question exists as to CKB's liability.

---

4. The record does not reveal why CKB produced so much No. 6 fuel oil, an inexpensive product. The high production of No. 6 fuel oil may have been related to the characteristics of the crude oil delivered or to Moore's belief about future market conditions for fuel oil as winter approached.

## Damages

CKB asserts that a genuine issue of material fact exists as to the amount of damages MMP suffered. CKB argues that: (1) MMP failed to prove a causal link between breach of the contract and any loss resulting to MMP; (2) there is a fact question about what quantities CKB actually delivered to MMP; and (3) a trier of fact must determine whether MMP's December 1981 invoice for volume deficiencies estopped MMP from seeking damages in excess of the invoice amount.

■ CKB's causation argument is unpersuasive. CKB contends that MMP has not proved that it suffered any detriment due to CKB's breach of the contract, and that if MMP suffered any loss, the loss was not foreseeable. CKB cites *LeBlanc, Inc. v. Gulf Bitulithic Co.*, 412 S.W.2d 86, 94 (Tex.Civ.App.—Tyler 1967, writ ref'd n.r.e.), for the proposition that MMP must establish a causal link between CKB's breach and MMP's damages. In the abstract, the point is valid, but it has no application to this case. According to the petroleum processing agreement, MMP was entitled to a certain quantity (within a narrow range) of a high-priced product, which it intended to resell. CKB delivered much less of the high-priced product and substituted other products that fetched lower prices. Those facts establish the causal link as long as MMP could have sold the JP–4.

The summary judgment evidence establishes that MMP could sell JP–4 in greater quantities than it received. William Wicker testified by affidavit that MMP had entered into futures contracts and had pre-sold much of the expected JP–4. When the jet fuel did not arrive, MMP had to delay previously scheduled shipments. William Harris conceded in his deposition that MMP sold some of the JP–4 to Jet Fuel Trading Company and to OKC Trading Company, both CKB affiliates. Harris admitted that MMP also sold JP–4 to an unrelated company, Oklahoma Refining. CKB introduced no summary judgment evidence which contradicted MMP's evidence that it sold all the JP–4 that CKB shipped and could have sold more. CKB's witnesses testified that JP–4 is difficult to sell, but their opinions are insufficient to rebut evidence that MMP made the sales.

CKB cites *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex.1981), for its argument that MMP's damages are uncompensable because they are unforeseeable. Again, in the abstract, the point is valid. Damages not reasonably foreseeable are generally uncompensable. *See Hadley v. Baxendale*, 9 Exch. 341, 354 (1854). However, that proposition has nothing to do with this case. MMP contracted to receive a specific quantity (within a narrow range) of a high-priced fuel. CKB delivered much less of the high-priced fuel and substituted less valuable fuels, which MMP could sell only at lower prices. We believe the damages were foreseeable. We do not believe that *Mead* supports CKB's position. *Mead* involved breach of a contract to buy a business. In that case, the buyer of a business agreed to pay the seller's prior trade creditors. He failed to pay them. The seller sued and claimed damages for loss of credit. The Supreme Court noted that previous Texas cases denied recovery of actual damages for loss of credit rating on the ground that the loss was too speculative. In *Mead*, the Supreme Court ruled that parties may recover actual damages for damage to credit resulting from breach of contract.

■ CKB contends that a fact question exists as to how much LPG and No. 6 fuel oil it delivered to MMP. CKB does not dispute MMP's figures for JP–4 jet fuel, gasoline, kerosene, No. 2 distillate, and flux. MMP contends that there is no dispute because Wicker and Harris allegedly stipulated the quantities delivered in the document signed on December 17, 1981, before the litigation began. Writings signed before litigation and later disputed are not stipulations. They are merely evidentiary admissions. *See Kinner Transportation & Enterprises, Inc. v. State*, 614 S.W.2d 188, 189–90 (Tex.Civ.App.—Eastland 1981, no writ); TEX.R.CIV.EVID. 801(e)(2). A trier of fact may consider them, but they are not binding. MMP also

contends that there is no summary judgment evidence to support the delivery figures which CKB claims. More specifically, MMP contends that nothing in the record supports CKB's numbers for LPG and No. 6 fuel oil except CKB's denials of MMP's requests for admissions. We agree. Our search of the record reveals no other summary judgment proof that supports CKB's numbers. Denials made in response to requests for admissions are not proper summary judgment evidence. *City of Richland Hills v. Bertelsen*, 724 S.W.2d 428, 431 (Tex.App.—Fort Worth 1987, no writ); *Griffith v. Pecan Plantation Owners Ass'n, Inc.*, 667 S.W.2d 626, 628 (Tex.App. —Fort Worth 1984, no writ). Since the record contains no summary judgment evidence that supports CKB's numbers, MMP's summary judgment evidence on the quantities of LPG and No. 6 fuel oil delivered is uncontroverted. No fact issue arises from uncontroverted evidence. TEX. R.CIV.P. 166a(c). We conclude therefore that no genuine issue of material fact exists as to the quantities of fuels delivered to MMP.

■ CKB further claims that a genuine issue of material fact exists as to whether MMP's deficiency invoice for $1,658,590.10, dated December 21, 1981, operates as an estoppel against MMP that bars any claim for additional damages. CKB argues in essence that the act of sending a pre-litigation demand for payment estops the sender from later claiming damages not included in the demand. We find no support for that proposition. CKB cites none. CKB also argues that the mere pleading of estoppel automatically creates a jury issue on the existence of estoppel. CKB cites the Supreme Court opinion that dealt with the severed cause of action for wrongful presentment of the letter of credit. *See CKB & Associates v. Moore McCormack Petroleum, Inc.*, 734 S.W.2d 653 (Tex.1987). The Texas Supreme Court opinion provides CKB little comfort. The court did not hold that pleading estoppel automatically creates a jury issue. The court concluded instead that, when the intent of the parties to an agreement is relevant, and the agreement does not make the intent clear, a fact issue exists as to the intent. *CKB & Associates*, 734 S.W.2d at 656. MMP's volume deficiency invoice was not an agreement between MMP and CKB. Therefore, their mutual understanding of the document is not relevant. We find no basis for estoppel, and we see no fact issue for a jury to determine. In addition, CKB failed to plead estoppel in the trial court. Estoppel is an affirmative defense. It is lost if not specifically pleaded. TEX.R. CIV.P. 94. Having failed to plead estoppel, CKB may not now assert it on appeal. *Chapa v. Herbster*, 653 S.W.2d 594, 602 (Tex.App.—Tyler 1983, no writ).

We find that no genuine issue of material fact exists as to any of the questions related to the determination of MMP's damages. We overrule all of CKB's points of error that assert the contrary.

■ Finally, CKB asserts that the trial court used a standard erroneous as a matter of law in determining the amount of CKB's offset against MMP. We agree. The petroleum processing agreement required CKB to use its best efforts to hit the targets specified in Exhibit "A" within 1% tolerance. We have construed this provision to mean that CKB could have performed fully its obligation either by using its best efforts (see discussion above) or by producing within the Exhibit "A" target ranges. The contract allowed for a 1% variation in either direction from the specific target. MMP accepted deliveries of gasoline, kerosene, No. 2 distillate, and No. 6 fuel oil that exceeded the target range. The trial court awarded CKB credit against MMP's damages for the value of excess quantities delivered above 101% of the Exhibit "A" targets.

We hold that the trial court erred as a matter of law in fixing 101% of the Exhibit "A" targets as the standard of full performance. Had CKB delivered 99% of Exhibit "A" target for each fuel, MMP would have had no cause of action for quantity deficiencies under the contract. Therefore, delivery of 99% of the Exhibit "A" targets represents full performance. In a suit for breach of contract, MMP is entitled to re-

ceive the full benefit of its bargain—but nothing more. *Thomas C. Cook, Inc. v. Rowhanian,* 774 S.W.2d 679, 686 (Tex.App.—El Paso 1989, writ denied). 99% was the full benefit. Any deliveries above 99% begin reducing MMP's damages. The trial court should have used 99% of the Exhibit "A" targets as the standard from which to calculate the amount of the offset and subtracted that amount from MMP's breach of contract damages.

| Fuel | 99% of Contract target barrels | Actual delivery barrels | Surplus barrels | $ Price per barrel |
|---|---|---|---|---|
| Gasoline | 549,351 | 570,161 | 20,810 | 39.69 |
| Kerosene | 89,646 | 102,941 | 13,295 | 41.79 |
| No. 6 fuel oil | 24,205 | 100,358 | 76,153 | 24.85 |
| No. 2 distillate | 278,351 | 329,540 · | 51,189 | 40.95 |

| Value of surpluses in dollars | | Total value of surpluses in dollars |
|---|---|---|
| Gasoline | 825,949 | 5,370,139 |
| Kerosene | 555,598 | |
| No. 6 fuel oil | 1,892,402 | |
| No. 2 distillate | 2,096,190 | |

|  | Dollars |
|---|---|
| MMP's damages for breach of contract as proved by summary judgment evidence. | 7,190,125 |
| —Sight draft presented by MMP | −1,658,590 |
| —Credit owing to CKB for surplus quantities delivered and accepted | −5,370,139 |
| | 161,396 |

Our calculations reveal that after allowing for the sight draft MMP presented and for the credit owing to CKB, MMP is entitled to collect $161,396 in breach of contract damages rather than the $939,065 found by the trial court.

We sustain CKB's point of error that concerns the proper standard for measuring damages. We will modify the judgment of the trial court to reflect our holding and the calculations outlined above. *See* Tex.R.App.P. 80(b)(2).

## MMP's Cross-points

MMP asserts two cross-points of error: 1) that no summary judgment evidence existed on which the trial court could base the offset it awarded CKB for surplus fuel delivered; and 2) that the trial court erred in entering a final judgment that awarded MMP prejudgment interest (a) compounded annually instead of daily (b) from June 20, 1982, instead of from December 20, 1981, to the date of judgment. We overrule MMP's first cross-point. We sustain the second cross-point.

## Legal Analysis

■ MMP argues that CKB did not plead that it was entitled to an offset for the overproduction that MMP accepted and that CKB failed to provide the summary judgment evidence necessary to prove the amount of the offset. We disagree. CKB's summary judgment pleadings do not mention offset or quantum meruit for the value of surplus fuel delivered, but they affirmatively state that CKB delivered gasoline, kerosene, No. 2 distillate, and No. 6 fuel oil to MMP in quantities beyond the agreed performance range. The pleadings also allege that CKB is entitled to credit for the overproduction against MMP's damages. *See* Tex.R.Civ.P. 94.

CKB should have pleaded its "offset" as a counterclaim in quantum meruit for the

value of the benefits conferred. *Mann v. Jack Roach Bissonnet, Inc.*, 623 S.W.2d 716, 718 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). However, the pleading allegations announced the existence of CKB's claim and the general facts that supported it. Given the fact that MMP possessed the same information available to CKB, MMP cannot claim that it suffered any prejudice due to the imperfect pleading. In addition, Texas courts have long recognized a misnomer rule. A pleading that gives adequate notice will not fail merely because the draftsman named it improperly. Tex.R. Civ.P. 71. A pleading's substance is determined by the effect the pleading would have if granted by the trial court. *Austin Neighborhoods Council, Inc. v. Board of Adjustment*, 644 S.W.2d 560, 565 (Tex.App.—Austin 1982, writ ref'd n.r.e.). CKB's pleading, if granted, would have entitled it to deduct the value of its surplus deliveries from MMP's damages. A counterclaim in quantum meruit would have accomplished the same result. The pleading, though imperfect, put CKB's claim before the court.

■ We also conclude that the summary judgment evidence necessary to calculate CKB's "offset" (quantum meruit counterclaim) was properly before the trial court. In order to calculate the amount of CKB's "offset," the trial court needed summary judgment evidence of the terms of the petroleum processing agreement, including Exhibit "A;" the quantities of refined products actually delivered and accepted; and the per barrel prices of those products. The rest can be determined with a pocket calculator. Both sides put the agreement, including Exhibit "A," before the court. MMP's summary judgment evi-

dence of the quantities actually delivered was properly before the court. Where MMP's figures and CKB's numbers conflicted, the trial court used MMP's figures. (See discussion above on the absence of a fact issue on amount of MMP's damages.) Summary judgment evidence of per barrel prices came in from several sources, any one of which is sufficient: the affidavit of Clifford Reeve, CKB's admissions in MMP's request for admissions,[5] and MMP's demand letter of December 21, 1981. MMP used the demand letter, listing the values of the refined products, in its deposition of William Harris. CKB introduced the letter in its answer to MMP's motion for partial summary judgment. Because the trial court had all the summary judgment evidence necessary to calculate the amount of CKB's "offset," we overrule MMP's first cross-point.

■ MMP's second cross-point argues that the trial court erred by awarding prejudgment interest (a) compounded annually instead of daily (b) from June 20, 1982, instead of from December 20, 1981, to the date of judgment. We agree. In *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), the Texas Supreme Court held that "a prevailing plaintiff may recover prejudgment interest compounded daily (based on a 365–day year) on damages that have accrued by the time of judgment." *Cavnar*, 696 S.W.2d at 554. The prejudgment interest accrues at the prevailing rate that exists on the date the judgment is rendered. Tex.Rev.Civ.Stat. Ann. art. 5069–1.05, § 2 (Vernon 1987).

*Cavnar* was a wrongful death case. Because cases only hold on their facts, the

---

5. While denials to requests for admissions are not summary judgment evidence, we believe admissions may be so used. *See* Tex.R.Civ.P. 166a(c). We recognize the existence of some contrary authority. *Griffith,* 667 S.W.2d at 628, declares that a party may not use its admissions (as opposed to denials) in requests for admissions as summary judgment evidence. We have read the authority *Griffith* cites and we believe *Griffith* misquotes that authority. *See Fort Bend Independent School District v. Weiss,* 570 S.W.2d 241, 243 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ). *Weiss* dealt with interrogatories, not requests for admissions. Admissions and

interrogatories are different, due to the binding nature of admissions. Admissions remove a matter from controversy. Interrogatories do not. We reject the notion that information may establish a fact conclusively and yet be unavailable as summary judgment evidence. We note that the rules governing interrogatories state explicitly that interrogatories are admissible only against the party answering them. Tex.R. Civ.P. 168. The rules governing admissions state that admissions are conclusive as to the party making them, but the rules do not say that that party cannot use its admissions as summary judgment evidence.

computation of prejudgment interest in breach of contract cases remained in doubt until the decision in *Perry Roofing v. Olcott,* 744 S.W.2d 929 (Tex.1988). The Texas Supreme Court held in *Perry Roofing* that when the amount of contract damages cannot be ascertained from the face of the contract, the rule established in *Cavnar* applies. *Perry Roofing,* 744 S.W.2d at 931. In our case, MMP's damages cannot be determined from the face of the petroleum processing agreement. The *Cavnar* rule applies. Prejudgment interest will compound daily at the judgment rate announced by the consumer credit commissioner in December 1989, the month before the rendition of summary judgment in this case. TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 2 (Vernon 1987). That rate is 10%. 14 Tex.Reg. 6896 (December 29, 1989).

For personal injury and wrongful death actions prejudgment interest begins accruing six months after the injury. However, for other actions interest accrues from the date of the injury. *Cavnar,* 696 S.W.2d at 555. Interest shall begin to accrue as of December 20, 1981, the date of the breach of the petroleum processing agreement. Accrual of prejudgment interest shall terminate on January 8, 1990, the date of judgment. We modify the judgment of the trial court with respect to prejudgment interest in accordance with our holding.

### Conclusion

We affirm the judgment of the trial court as to CKB's liability under the contract. We modify the trial court's judgment as to damages by applying the correct legal standard and recalculating damages based on that standard. The judgment, as modified, shall reflect that CKB owes $161,396 in damages, plus prejudgment interest. We affirm the trial court's award of attorneys' fees. As modified, the judgment is affirmed.