**MEDICAL COMPONENTS, INC. and Martech Medical Products, Inc. Plaintiffs/Counter–Defendants,**

v.

**OSIRIS MEDICAL, INC., and Raul Garcia, Jr., Defendants/Counter–Claimants.**

**EP–15–CV–305–PRM**

United States District Court, W.D. Texas, El Paso Division.

Signed 12/29/2016

---

Alfred W. Zaher, Pro Hac Vice, David Schumacher, Pro Hac Vice, Maryellen Madden, Pro Hac Vice, Shawn Li, Pro Hac Vice, Buchanan Ingersoll & Rooney P.C., Philadelphia, PA, James G. Warriner, Gilbert Andrew Greene, Norton Rose Fulbright US LLP, Austin, TX, Ken K. Slavin, Kemp Smith, P.C., El Paso, TX, for Plaintiff.

Clyde A. Pine, Jr., Mounce, Green, Myers, Safi, Paxson & Galatzan, P.C., El Paso, TX, Joseph P. Grimes, Joseph P. Grimes, Esquire, LLC, Haddonfield, NJ, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART COUNTER–DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PHILIP R. MARTINEZ, UNITED STATES DISTRICT JUDGE

On this day, the Court considered Counter–Defendants Medical Components, Inc. ("Medcomp") and Martech Medical Products, Inc.'s ("Martech") "Motion for Summary Judgment" (ECF No. 114), filed on August 31, 2016, Counter–Claimants Osiris Medical, Inc. ("Osiris") and Raul Garcia, Jr.'s "Response ... in Opposition to Plaintiff's Medical Component, Inc.'s Motion for Summary Judgment" (ECF No. 120) [hereinafter "Response"], filed on September 14, 2016; and Medcomp and Martech's "Reply Brief in Support of Motion for Summary Judgment" (ECF No. 124) [hereinafter "Reply"], filed on September 20, 2016, in the above-captioned cause.[1]

For the reasons discussed below, the Court will grant in part and deny in part Medcomp's Motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a dispute concerning a patent license agreement ("PLA") involving Garcia's patented Huber needle—United States Patent No. 7125,398 ("the '398 Patent Needle"). Second Am. Compl. for Declaratory J. of Non–Infringement of U.S. Patent No. 7125,398 1, July 22, 2016, ECF No. 95. Osiris granted Medcomp a license to use the intellectual property rights to manufacture and sell the '398 Patent Needle. Mot. Ex. B, at 1 [hereinafter "PLA"].

Medcomp and Osiris executed the PLA on December 20, 2011 (the "Effective Date"). PLA 10. The PLA specifically provides for a three-year term starting from the Effective Date; as a result, the PLA expired on December 20, 2014 ("Termination Date"). *Id.* at 5.

### A. Relevant PLA Provisions

The PLA contains the following relevant provisions: Integration Clause, Best Efforts Provision, Discretionary Clause, Notice and Cure Provision, and Minimum Royalty Provision.

The Integration Clause provides as follows:

> This Agreement represents the entire, final, and integrated agreement between [Medcomp and Osiris] as of the Effective Date. This Agreement can only be modified by the mutual agreement of both [Medcomp and Osiris] in writing.

*Id.* at 6.

The Best Efforts Provision states that Medcomp "shall use good faith, best ef-

---

1. Although Martech joins in Medcomp's Motion, Osiris's Counterclaims, which are rooted in the patent license agreement, are brought against Medcomp exclusively. Osiris and Medcomp are the only two signatories to the PLA. Accordingly, the Court finds that Martech is not a party to the counterclaim and lacks standing to file and recover under the Motion. *See Norris v. Housing Auth. of Galveston,* 980 F.Supp. 885, 892 (S.D. Tex. 1997) ("In Texas, it is an elementary rule of law that privity of contract is an essential element of recovery in an action based on a contractual theory."); *see also Compass Bank v. Veytia,* No. EP–11–CV–228–PRM, 2011 WL 6046530, at *4 (W.D. Tex. Dec. 5, 2011) (noting that "Counterclaims ... [which] are based on [counter-claimant's] contracts and relationship" with counter-defendant precludes co-counter-claimants to bring such counterclaims because the co-counter-claimants lack standing). Consequently, the Court will construe the Motion as one that Medcomp brings.

forts to market and sell all [the '398 Patent Needle] manufactured." *Id.* at 3.

The Discretionary Clause provides as follows:

> [Medcomp] makes no guarantees, representations, warranties, or promises regarding its sales activity of the ['398 Patent Needle] and shall in its sole discretion devote as much or as little (or none) of its time and resources to selling the ['398 Patent Needle].

*Id.* at 7.

The Notice and Cure Provision requires the non-breaching party to provide written notice to the breaching party. *Id.* at 8. After receiving notice, the breaching party is afforded an opportunity to have thirty or sixty days to cure the monetary or non-monetary breach, respectively. *Id.*

The PLA's Minimum Royalty Provision further provides a royalty payment from Medcomp to Osiris. *Id.* at 2. Namely, the Minimum Royalty Provision outlines that Medcomp is projected to sell the following amounts of the '398 Patent Needle:

- 225,000 during the "First Year";

- 262,500 during the "Second Year"; and

- 325,000 during the "Third Year."

*Id.* In the event that Medcomp's sales exceeded any of those amounts during the respective "Year," Medcomp would pay a royalty rate. *Id.*

The PLA defines the "First Year," "Second Year," and "Third Year" as the "period from the Validation Date to the last day of the month falling [twelve, twenty-four, and thirty-six] months [respectively] after the Validation Date." *Id.* at 1.[2]

Medcomp made payments to Osiris until the Termination Date of December 2014. *See* Mot. 8–9.[3]

## B. Instant Motion for Summary Judgment

On October 19, 2015, Medcomp and Martech initiated the instant declaratory action requesting that the Court determine that they did not infringe upon the '398 Patent Needle. *See* Compl. for Declaratory J. of Non–Infringement of U.S. Patent No. 7125,398, Oct.19, 2015, ECF No. 1.

Eventually, Osiris filed its "First Amended Counterclaims" (ECF No. 103), on August 5, 2016, asserting five causes of action against Medcomp:

1. Breach of Contract for Payment of Minimum Royalties;

2. Breach of Contract for Payment of Excess Royalties;

3. Breach of Express Covenant of Best Efforts;

4. Demand for Full Audit; and

5. Counterclaim of Garcia as Co-inventor of V4.[4]

First Am. Countercl. 25–42.

As a result, Medcomp now brings the instant Motion arguing that it is entitled to

---

**2.** The PLA further defines Validation Date as the earlier of two possible dates: (1) the date on which Medcomp received validated and verified parts; or (2) June 1, 2012—which is almost six months after the Effective Date. *Id.* at 1.

**3.** Osiris contends that Medcomp defaulted on the PLA on February 20, 2015—two months after the PLAs Termination Date. *See* Resp. 7. The parties do not provide evidence that spec-

ifies the PLA due dates and the amounts tendered.

**4.** The Court previously granted Medcomp's motion to dismiss Osiris's fifth claim of co-inventorship. *See* Order Granting Pl.'s Mot. to Dismiss 5–7, Sep. 19, 2016, ECF No. 122. The Court held that it had no authority to adjudicate inventorship regarding pending patents such as V4. *See id.*

summary judgment on the remaining four causes of action. Mot. 20. In its Response, Osiris abandoned the following two claims: its Breach of Contract for Payment of Excess Royalties (Claim 2) and its Demand for Full Audit (Claim 4). Resp. 11, 16 ("Osiris withdraws counterclaim count two .... Osiris agreed that discovery in the present litigation would suffice for the audit.").[5]

Consequently, the Court will address the remaining two causes of action: Breach of Contract for Payment of Minimum Royalties and Breach of Express Covenant of Best Efforts.

## II. LEGAL STANDARD

### A. Summary Judgment

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute regarding a material fact exists if there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a motion for summary judgment, "[t]he moving party bears the initial burden of showing that there is no genuine issue for trial; it may do so by 'pointing] out the absence of evidence supporting the nonmoving party's case.'" *Nat'l Ass'n of Gov't Emps.*, 40 F.3d 698, 712 (5th Cir. 1994) (quoting *Latimer v. Smithkline French Labs.*, 919 F.2d 301, 303 (5th Cir.

1990)). If the moving party has satisfied its initial burden, the nonmovant must then come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348, 'conclusory allegations,' *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), 'unsubstantiated assertions,' *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994), or only a 'scintilla' of evidence, *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir. 1994)." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

■ A court conducting a summary-judgment analysis must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). Thus, a court should "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. A court should not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* (citing *Lujan*, 497 U.S. at 888, 110 S.Ct. 3177).

### B. Diversity Case

"The federalism concern of *Erie* [*Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ] is applicable to every federal tribunal when federal sub-

---

**5.** The Court has already granted Osiris and Garcia's "Motion for Summary Judgment... Dismissing Plaintiffs' Second Amended Complaint with Prejudice for Lack of Subject Matter Jurisdiction under Article III of the U.S. Constitution" (ECF No. 115). *See* Order Granting Defs.' Mot. for Summ. J., Dec. 29,

2016, ECF No. 128. Therein, the Court mooted Osiris's motion to compel discovery on the basis that this discovery motion pertained to Medcomp's declaratory action. *See id.; see also* Def. Osiris Medical, Inc.'s Mot. to Compel Doc. Disc. Resps. from Pls., July 30, 2016, ECF No. 99.

stantive law has not expressly or impliedly displaced the state substantive law on the particular question for decision." *Pennzoil Co. v. F.E.R.C.*, 645 F.2d 360, 384 (5th Cir. 1981). Because Osiris's Counterclaims are embedded in contract law, the Court must apply state substantive law. *See Erie R.R. Co.*, 304 U.S. at 78, 58 S.Ct. 817. "[F]ederal courts must apply the choice of law rules in the forum state in which the court sits." *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003). Consequently, the Court will apply Texas law in the instant matter.

## III. DISCUSSION

### A. Breach of Contract for Payment of Minimum Royalties

 Medcomp and Osiris agree that the PLA includes a three-year Minimum Royalty Provision. *See* Mot. 9; Resp. 7. The parties disagree, however, whether the Minimum Royalty Provision would extend beyond the Termination Date.

Medcomp argues that the PLAs duration was from December 2011 to December 2014. Mot. 9. Therefore, Medcomp argues that it was not obligated to continue paying minimum royalties past the December 2014 Termination Date. *See id.* While Medcomp acknowledges that the Minimum Royalty Provision was set to last three years, the Minimum Royalty Provision did not take effect until six months later on June 2012—the Validation Date. *Id.* Therefore, Medcomp contends that the Minimum Royalty Provision expired contemporaneously with the PLA. *Id.*

Osiris counters that the Minimum Royalty Provision was always set for thirty-six months and not the thirty months Medcomp now argues is applicable. Resp. 7. In essence, Osiris argues that the Minimum Royalty Provision was to continue beyond the length of the PLA. *See id.* To bolster its argument, Osiris provides an affidavit from Medcomp's former Vice–President of Sales Michael Cellini ("Employee Cellini"). Resp. Ex. 2, at ¶ 3. Employee Cellini's affidavit purportedly supports Osiris's theory that the parties always intended that the Minimum Royalty Provision would have a thirty-six-month term rather than a thirty-month term. Resp. 11.

#### 1. PLA Term

 It is well settled that "[e]ach part of the contract should be given effect." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). "Contracting parties are free to structure their contractual undertaking and allocate risk as they see fit." *El Paso Field Servs., LP v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811–12 (Tex. 2012). "The role of courts is not to protect parties from their own agreements, but to enforce contracts that parties enter into freely and voluntarily." *Id.* at 810–11.

As previously noted, the PLA defines both the Effective Date and Validation Date. PLA 1. On one hand, the Effective Date began when Medcomp and Osiris signed the PLA, which occurred on December 20, 2011. *See id.* at 1, 10. On the other hand, the Validation Date was either: (1) the date in which Medcomp received validated and verified parts or (2) June 1, 2012. *Id.* at 1. Neither Medcomp nor Osiris have presented any evidence to the Court that they seek to invoke the first of two Validation Dates. Accordingly, the Court turns to the latter date of June 1, 2012— which is almost six months after the Effective Date—in order to give the Validation Date effect. *See Forbau*, 876 S.W.2d at 133. Notably, Employee Cellini acknowledges that the royalty payments would commence the "seventh month" after the Effective Date. *See* Resp. Ex. 2, at ¶ 12. Employee Cellini's suggestion substantiates the notion that the Validation Date is June 1, 2012. *See id.* Indeed, Osiris states that "Medcomp made the *correct* contract payments for the first 23 months com-

mencing [on] July 20, 2012." *See* Resp. 6–7 (emphasis added).

Thus, the PLA's First Year is the "period from the Validation Date [of June 1, 2012,] to the last day of the month falling 12 months after the Validation Date." PLA 1. Likewise, the PLA's Second and Third Years did not begin until twenty-four and thirty-six months, respectively, after the Validation Date. *Id.* at 1–2.

Despite these Minimum–Royalty–Provision obligations, the PLA expressly outlines that it terminates "*all* rights and obligations" three years after the Effective Date of December 2011. *See* PLA 5 (emphasis added). A plain reading of the PLA establishes that the PLA ceased on December 2014, which terminated "*all* rights and obligations" of the Minimum Royalty Provision. *See id.* (emphasis added). Because Medcomp had no obligation to comply with the Minimum Royalty Provision after the Termination Date, Medcomp is entitled to summary judgment on this cause of action.

### 2. Integration Clause

Despite the plain language of the PLA regarding its duration, Osiris contends that Employee Cellini's affidavit raises a factual dispute about the intent of the parties regarding the duration of the PLA. Resp. 11. When interpreting a contract, the Court must determine the parties' intentions as expressed in the instrument. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). The Court must ascertain that intent from the agreement itself and not from the parties' present interpretation. *See Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014). The Court must construe the written contract "to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol-evidence rule." *See id.*

An "integration clause" is a contractual provision that prevents the inclusion of prior agreements because all such understandings have been merged into the written document. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 335 (Tex. 2011) (noting that an integration clause limits the evidence available "should a dispute arise over the meaning of the contract"). A party may not introduce parol evidence to vary, add to, or contradict the terms of an unambiguous contract. *Brannon v. Gulf States Energy Corp.*, 562 S.W.2d 219, 222 (Tex. 1977). "When interpreting an integrated writing, the parol-evidence rule precludes considering evidence that would render a contract ambiguous when the document, on its face, is capable of a definite legal meaning." *Id.* Still, the parol-evidence rule does not prohibit the Court from "considering surrounding facts and circumstances that inform the contract text and render it capable of only one meaning." *See id.*

Here, the PLA contains an integration clause. *See* PLA 6. Indeed, Osiris concedes that one exists. *See* Def. Osiris Medical, Inc.'s Mot. to Dismiss Pl. Medical Component, Inc/s Counterclaim for Failure to Comply with Scheduling Order (ECF 36) and for Failure to State a Claim ..." 8, May 4, 2016, ECF No. 72 (noting that the "PLA contains an integration clause at paragraph 13").

Yet, Osiris suggests that Employee Cellini's affidavit raises a factual dispute regarding the contracting parties' intentions. Normally, the parol evidence rule has no bearing on third parties, also known as strangers to the contract. *See Excel Willowbrook, LLC v. JP Morgan Chase Bank, Nat. Ass'n*, 758 F.3d 592, 600 n.19 (5th Cir. 2014) ("The parol evidence rule ... extends only to parties to the written instrument, those in privity with such a party or

one who claims a right or benefit under the contract; the rule is inapplicable to situations where one of the litigants is a stranger to the agreement." (emphasis omitted) (quotation omitted)). As an employee for Medcomp at the time of the Effective Date, Employee Cellini is not a stranger to the contract; thus the parol evidence rule applies with equal force to him. *See Cowan v. Rodgers*, No. 05–92–01443–CV, 1993 WL 220336, at *2 (Tex. App.–Dallas June 23, 1993, writ denied) ("Texas courts consider an employee's or agent's acts to be the acts of the employer itself and do not treat an employee or agent as third-party stranger to the contract.").

Nevertheless, under Texas law, any alleged agreements or understandings not contained in the PLA are barred by the parol evidence rule. *See Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169, 174 (5th Cir. 1990). Only where the Court first determines that a contract is ambiguous may the Court consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument. *See Constitution State Ins. Co. v. Iso–Tex Inc.*, 61 F.3d 405, 408 (5th Cir. 1995). The Court concludes that the Validation Date and duration of the PLA are unambiguous. The PLA expressly sets forth the Validation Date of June 1, 2012, and the duration of three years from the Effective Date. *See supra* Section III.A.1. Above all, the PLA explicitly provides that the PLA will terminate "*all* rights and obligations" on December 20, 2014, including any obligations pursuant to the Minimum Royalty Provision. *See* PLA 6.

Accordingly, the Court declines to consider the parol evidence of Employee Cellini's affidavit in interpreting what either party understood regarding the PLA terms given its determination that the PLA is unambiguous.

## B. Breach of Express Covenant of Best Efforts

### 1. Fact Issue whether Medcomp Used its Best Efforts

Pursuant to Texas law, a "best efforts" provision of a contract is enforceable if it provides an objective and specific goal against which a party's efforts can be measured. *CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 581 (Tex. App.–Dallas 1991, writ denied) ("[T]o be enforceable, a best efforts contract must set some kind of goal or guideline against which best efforts may be measured."); *Kevin v. M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 326 (5th Cir. 2011) ("[The Fifth Circuit has] recognized that *CKB & Associates* ... is instructive on the issue of how to interpret a 'best efforts' clause in a contract in Texas"); *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 559 (5th Cir. 2002).

Once the goal or guideline is identified, "the next inquiry is whether the party met the goal. If the answer is yes, the analysis ends and whether the party used its 'best efforts' is irrelevant." *Herrmann Holdings*, 302 F.3d at 559. "If, however, the goal is not met, it becomes necessary to measure the party's efforts 'by the circumstances of the case and by comparing the party's performance with that of an average, prudent, comparable operator.'" *Id.* (quoting *CKB & Assocs.*, 809 S.W.2d at 582). "Whether a contractual best efforts obligation has been met or fulfilled is usually *a question of fact* because it is heavily dependent upon the particular circumstances of the case." *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 174 (Tex. App.–Ft. Worth 2012, no pet. h.)(emphasis added).

The Court has previously found that the PLA outlines objective goals. *See* Order Granting Pls.' Mot. to Dismiss Countercls.

16–17, Mar. 4, 2016, ECF No. 40 (finding that the PLA "provides objective goals and guidelines").

Therefore, the next inquiry is whether Medcomp manufactured the following amounts of '398 Patent Needles: 225,000, in Year One, 262,500 in Year Two and 325,000 in Year Three. PLA 2; *see also Herrmann Holdings*, 302 F.3d at 559.

Medcomp concedes that it did not meet the PLA benchmarks. *See* Resp. Ex. A, at 116 [hereinafter "Schweikert Deposition"]. Osiris President Tim Schweikert indicated that Medcomp only manufactured 100,-000 '398 Patent Needles in Year Three. Schweikert Deposition 116. Medcomp counters that the PLA "contains no promise" that it would manufacture any amount of the '398 Patent Needles. Mot. 4. Medcomp's statement belies the express language of the PLA: "[Medcomp] projects to *manufacture* at least 225,000 units in the Product in the First Year, and 262,500 units of the Product in the Second Year, and 325,000 units of the Product in the Third Year." PLA 2 (emphasis added).

Because Medcomp failed to meet the benchmarks, "it becomes necessary to measure the party's efforts 'by the circumstances of the case and by comparing the party's performance with that of an average, prudent, comparable operator.'" *See Herrmann Holdings*, 302 F.3d at 559 (quoting *CKB & Assocs.*, 809 S.W.2d at 582).

The Court finds that a factual dispute emerges regarding whether Medcomp used its best efforts when compared to that of a prudent operator. *See id.* Initially, Osiris introduced Medcomp to Integra Biomedical—a company that Garcia allegedly vouched had the capacity to make Huber needles. Schweikert Dep. 147. Notwithstanding the introduction, Medcomp contends that Integra Biomedical "never produced a commercially saleable" '398 Patent Needle. *See* Mot. 5; *see also*

Schweikert Dep. 39–40. Despite Integra Biomedicars purportedly shoddy design, Medcomp avers it "did not sit on its hands." Mot. 5. According to Medcomp, it and Martech worked with Integra Biomedical to improve the '398 Patent Needle. *See* Mot. Ex. E. After Integra Biomedical continued to produce subpar '398 Patent Needles, Medcomp resorted to seeking assistance from Martech to produce 100,000 units. *See* Schweikert Dep. 116–21.

A fact-finder must answer the following: whether an "average, prudent, comparable operator" would have, *inter alia*, continued to work with Integra Biomedical after it produced subpar '398 Patent Needles? Were the Integra Biomedical '398 Patent Needles, in fact, subpar? Should Medcomp have sought another manufacturer sooner? Was it reasonable for Medcomp to rely on Osiris's recommendation of using Integra Biomedical as a manufacturer? The foregoing constitutes a sampling of pertinent questions that the fact-finder must answer to determine whether Medcomp breached the Best Efforts Provision.

As a result, the Court will deny Medcomp's Motion because this claim presents a genuine factual issue, which can only be resolved by a fact-finder. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

### 2. Medcomp Did Have an Obligation to Use its Best Efforts

■ Nevertheless, Medcomp contends that it was not obligated to comply with the Best Efforts Provision for two reasons: (1) the Discretionary Clause relieves Medcomp of its responsibilities under the Best Efforts Provision; and (2) Osiris failed to comply with the Notice and Cure Provision thereby releasing Medcomp of its obligations under the Best Efforts Provision. Mot. 10–12. The Court disagrees and finds that Medcomp still had an obligation to comply with the Best Efforts Provision.

### i. Discretionary Clause

Texas courts employ the canon of construction that specific provisions control over general ones. *See Matter of Pirani*, 824 F.3d 483, 494 (5th Cir. 2016) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)). "Of course the general/specific canon is not an absolute rule, but is merely a strong indication of statutory meaning that can be overcome by textual indications that point in the other direction." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 132 S.Ct. 2065, 2072, 182 L.Ed.2d 967 (2012).

The Discretionary Clause provides as follows:

> [Medcomp] makes no guarantees, representations, warranties, or promises regarding its sales activity of the ['398 Patent Needle] and shall in its sole discretion devote as much or as little (or none) of its time and resources to selling the ['398 Patent Needle].

PLA 7. This broad, unfettered Discretionary Clause stands in contrast to the Best Efforts Provision. The specific benchmarks enumerated in the Best Efforts Provision would be rendered meaningless if the Discretionary Clause controls. Given that the PLA centers on Medcomp meeting certain benchmarks, the Court finds that the specific Best Efforts Provision should control over the general Discretionary Clause. *See Matter of Pirani*, 824 F.3d at 494. Therefore, Medcomp's argument that the Discretionary Clause absolves its obligation under the contract is without merit. *See id.*

### ii. Notice and Cure Provision

 Notice and cure clauses are found in a number of different contracts, and are generally enforceable as valid contract terms. *E.g., Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232, 233 (Tex. 1982) (maker of note must comply with acceleration clause requiring notice and cure period). To be sure, the Notice and Cure Provision presumes that a breach has occurred. Given that there is a factual dispute regarding whether a breach of the Best Efforts Provision occurred, the Court cannot determine, at this juncture, whether Osiris failed to comply with the Notice and Cure Provision. As a result, the Court will not address this issue at this time.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Counter–Defendants Medical Components, Inc. and Martech Medical Products, Inc.'s "Motion for Summary Judgment" (ECF No. 114) is **GRANTED IN PART AND DENIED IN PART.**