**Affirmed and Majority and Concurring Opinions filed April 28, 2022.**



In The

# Fourteenth Court of Appeals

### NO. 14-20-00558-CV

## LITIGATION & RECORDS SERVICES, LLC, Appellant

### V.

## QTAT BPO SOLUTIONS, INC., Appellee

### and

## QTAT BPO SOLUTIONS, INC., Cross-Appellant

### V.

## LITIGATION & RECORDS SERVICES, LLC; JAMES LEE, JR.; JAMES LEE LAW FIRM, PC; LEE & MURPHY LAW FIRM, GP; CLAYTON A. CLARK; CLAYTON A. CLARK, ESQ., PC; AND CLARK LOVE & HUTSON, GP, Cross-Appellees

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2015-50482**

# MAJORITY OPINION

This appeal involves a commercial dispute between a litigation services entity and its subcontractor. A group of Houston lawyers formed a record retrieval and review company, Litigation & Records Services, LLC ("LRS"). LRS subcontracted some of its work to a company with operations in India, QTAT BPO Solutions, Inc. LRS and QTAT worked together for almost two years before the relationship soured and ultimately ended. QTAT sued LRS, and a jury found that LRS breached the parties' contract and, along with an individual lawyer associated with LRS, committed fraud. After the verdict, the trial court dismissed the fraud claim for insufficient evidence but signed a judgment awarding contract damages to QTAT.

Both sides appealed. LRS challenges the sufficiency of the evidence supporting the jury's contract damages finding, but we hold that legally sufficient evidence supports the award. QTAT challenges the trial court's dismissal of its fraud claim, but we hold that QTAT presented no evidence of an essential element of fraud: a material misrepresentation. We also find no merit to QTAT's complaint that the trial court abused its discretion in denying QTAT leave to amend its petition to add theories of derivative liability after the pleading deadline had passed. QTAT's remaining challenges to various discovery, summary judgment, and evidentiary rulings are moot.

We affirm the trial court's judgment.

## Background

Attorneys James Lee, Jr. and Clayton A. Clark practiced law together before Lee founded his own firm with attorney Erin Murphy, the Lee Murphy Law Firm ("Lee Murphy"). Clark remained at the firm now known as Clark Love & Huston

("Clark Love"). Both Lee and Clark, and their respective firms, represented claimants in mass-tort personal injury lawsuits, including suits against the manufacturers of transvaginal mesh.

In 2011, Clark Love and Lee Murphy formed LRS. LRS's purpose was to review potential claimants' medical records so that law firms (including the law firms that owned LRS) could assess possible claims arising in certain mass-tort litigation. LRS in turn sought to subcontract much of its record-review work to QTAT based on the rationale that QTAT could perform the work more inexpensively.

QTAT began work for LRS in January 2012, although Lee and Afshan Khan, QTAT's president, did not sign a written letter agreement until July 2012 (the "Contract"). We discuss the Contract's specific provisions below, but broadly speaking, the agreement confirmed the parties' understanding regarding "medical record retrieval and nurse review projects." LRS agreed to pay QTAT monthly for its reasonable and necessary invoices, which would be "at cost" and would not include any profit margin for QTAT. The invoices were to include "the actual necessary costs associated with QTAT hiring its employees for LRS projects." The Contract also expressed the parties' intent to split "net profits" 25% to QTAT and 75% to LRS. Any net profit would be calculated "after deduction of all overhead, expenses and fixed asset costs necessary to run the LRS business/QTAT business." The Contract contained several cautionary statements, such as "the future remains uncertain" and "LRS net profits remain unknown." But Lee also stated in the Contract that he was "confident and optimistic about the future" and that it was his intent "to realize a profit as soon as possible." According to QTAT, Lee orally represented to QTAT that, if QTAT agreed to bill only its costs and wait

to receive profits after settlement or litigation of the mass-tort dockets, QTAT stood to make $20 million.

QTAT provided record-retrieval, record-review, and data-entry services, for which it invoiced LRS approximately $1.9 million, representing twenty-two months of labor costs. LRS paid those invoices. QTAT also invoiced LRS for $821,108.53 in "operational and deployment expenses." LRS did not pay those invoices. Further, QTAT did not receive any profit share at any time. LRS contends that it never made a profit and, in fact, lost more than $9 million before shuttering in 2016.

LRS allegedly became increasingly frustrated with not realizing promised or expected savings and suspected that QTAT was overbilling. In November 2013, LRS terminated its agreement with QTAT. In 2015, QTAT filed suit against LRS, Lee, Clark, Lee Murphy, and Clark Love.[1] QTAT asserted claims for fraud, fraudulent inducement, breach of contract, unjust enrichment, quantum meruit, breach of fiduciary duty, and money had and received. QTAT also alleged theories of aiding and abetting and conspiracy and sought compensatory and exemplary damages, declaratory relief, costs, interest, and attorney's fees.

The trial court dismissed QTAT's conspiracy theory at the summary judgment stage. After other rulings narrowed the scope of the triable issues, the parties proceeded to a jury trial on QTAT's breach of contract, fraud, and quantum meruit claims.

QTAT presented evidence of its unpaid invoices. In support of its fraud claim, QTAT argued to the jury that LRS induced it to sign the Contract but never

---

[1] QTAT also named as defendants two other law firms associated with Lee and Clark (James Lee Law Firm, PC and Clayton A. Clark, Esq., PC), but those entities successfully moved for summary judgment on all of QTAT's claims and were not submitted as potentially liable parties in the jury charge.

4

intended to make a profit. As evidence, QTAT contended that LRS charged below-market rates for its services[2] and failed to track the necessary financial data from which it could calculate QTAT's 25% profit share. According to QTAT, if LRS lacked the means to allocate the revenues and expenses attributable to QTAT, that could only mean that LRS never intended to uphold its profit-sharing promise. QTAT also told the jury that LRS waited to invoice its clients until after the underlying lawsuits settled, which in some instances could be several years. This invoicing delay, QTAT claimed, contravened LRS's stated intention to realize a profit as soon as possible.

QTAT focused on two of these alleged choices—the choice to bill below-market rates and the choice to wait to invoice until the underlying mass-tort dockets settled—as illuminative of LRS's fraudulent motive. QTAT presented evidence that LRS represented in 2012 that nurse review charges would be billed to clients at $350 per review. However, at some point LRS decided to charge only $75 to its clients, thus ensuring that it would never make enough money to cover its incurred debt or make a profit. QTAT believed that a $75 rate was below prevailing market rates. QTAT's damages expert testified that, if LRS had charged market rates for each invoice on which QTAT worked, LRS would have made a profit.

LRS disputed that it never intended to make a profit. Erin Murphy, LRS's president, testified that litigation support is "a low-margin business." Attorney Sean Tracey, who was not affiliated with LRS but who used LRS in his mass-tort cases, testified that litigation support businesses are "difficult to run and labor intensive" and that he knew several attorneys who had tried to run similar

_____

[2] LRS invoiced its law firm clients for LRS's services. Those firms in turn recouped the medical review expenses from claimants' settlement or judgment recoveries, if successful. If a claimant's case was not successful, then the medical review expense would be a loss to the firm.

businesses and failed. Another factor allegedly contributing to LRS's lack of profitability was the high rent it paid for office space in a downtown Houston building, the same building in which Lee Murphy officed. LRS also had fifty to seventy employees, representing approximately $3 million in payroll expenses in 2012 and $4 million in 2013. Clark testified that his firm paid approximately $5.5 million into LRS in 2013 to cover the company's expenses. Murphy denied that LRS existed solely for Lee Murphy's or Clark Love's benefit. LRS had twenty-five different law firm clients, although Murphy acknowledged that most of those clients had "relationships" with Lee Murphy and/or Clark Love.

The jury found that LRS failed to comply with the Contract, causing $820,000 in damages, and that LRS and Lee committed fraud against QTAT, causing $2,946,853.10 in damages. The jury found against QTAT on its quantum meruit claim.

LRS and Lee moved for judgment notwithstanding the verdict ("JNOV") on QTAT's fraud claim, challenging the legal sufficiency of the evidence supporting all fraud elements: existence of an actionable misrepresentation; knowledge of falsity; intent; reliance; and damages. LRS also moved for JNOV on QTAT's breach of contract claim, arguing that there was no evidence of QTAT's compliance with the Contract, LRS's breach, or QTAT's damages.

The trial court signed an amended final judgment: (1) awarding QTAT $820,000 in compensatory damages against LRS for breach of contract and implicitly denying LRS's motion for JNOV on QTAT's contract claim; (2) granting JNOV on QTAT's fraud claim and ordering that QTAT take nothing for fraud; and (3) awarding pre- and post-judgment interest and costs of court.[3]

---

[3] The jury awarded zero attorney's fees.

LRS and QTAT both appeal.

## LRS's Appeal

In its sole issue on appeal, LRS argues that no legally sufficient evidence supports the jury's damages finding on QTAT's contract claim.

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *See id.* at 827. To sustain a challenge to the legal sufficiency of the evidence supporting a jury finding, the reviewing court must find that: (1) there is a complete lack of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence to prove a vital fact; or (4) the evidence conclusively established the opposite of a vital fact. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004).

Question 2 instructed the jury to consider as damages "[t]he difference, if any, between the amount LRS agreed to pay QTAT under the Agreement and the amount LRS actually paid QTAT under the Agreement." The jury answered, "$820,000."

Before turning to the parties' arguments, we summarize LRS's payment obligations under the Contract. LRS agreed to: (1) pay QTAT's reasonable and necessary invoices; and (2) split any net profits 25% to QTAT and 75% to LRS. Specifically, the Contract provided in relevant part:

> The parties agree **LRS shall pay QTAT for its reasonable and necessary invoices** on a monthly basis. QTAT agrees to produce

7

detailed invoices in the manner requested by LRS.  **The invoices shall be "at cost," and shall not include any profit margin for QTAT but shall include the actual necessary costs associated with QTAT hiring its employees for LRS projects**. . . .

**The intent of the parties is to split net profits 25% to QTAT and 75% to LRS**.  Net profits, if any, shall be calculated after deduction of all overhead, expenses and fixed asset costs necessary to run the LRS business/QTAT business including furniture, computers, phones, office supplies, employees, rent, insurance, parking, etc.  LRS shall be entitled to an offset or credit of all QTAT invoices which have been paid.  QTAT agrees to wait to be paid its share of any net profit until LRS realizes its actual accounts receivable and has the ability to calculate the same. . . .  QTAT shall only share in net profits related to invoices where QTAT has done substantially all of the work because the parties agreed that this would substantially reduce the overall overhead and expenses.  (Emphasis added).

The parties focus primarily on the second of LRS's payment obligations: the agreement to split any net profits.  To this end, LRS contends that QTAT presented no evidence of the relevant measure of damages set forth in the charge. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 784 (Tex. 2020) (court reviews evidentiary sufficiency using the measure submitted in the charge).  According to LRS, QTAT's damages expert "repeatedly admitted that his damages calculation was 'an alternative to the contract' and is 'not what's due under the contract.'"  LRS further argues that QTAT presented no other evidence to support the jury's $820,000 damage award.

The jury was free to consider any evidence establishing by a preponderance the difference, if any, between the amount LRS agreed to pay QTAT and the amount LRS actually paid QTAT.  LRS agreed to pay QTAT's reasonable and necessary invoiced costs.  QTAT invoiced LRS for $821,108.53, which LRS did not pay.  Those unpaid invoices included costs for "Operational Deployment" and "Monthly Operating Expenses."  Khan testified that the invoices represented

8

QTAT's "actual costs" "[d]eployed for this project," meaning "[e]verything, running the entire show, which would be the rent, the electricity, the computers, the new server for the office." Khan testified that Lee told her that LRS would reimburse those "deployment costs."

LRS does not dispute that it failed to pay these invoices, nor does it take issue with the reasonableness, necessity, or timeliness of the invoices or their amounts. There is no evidence the invoices included a profit margin. LRS nonetheless contends that QTAT cannot recover the invoiced amounts under the Contract because the only costs LRS promised to pay were those "actual necessary costs associated with QTAT hiring its employees for LRS projects." Under LRS's interpretation of the Contract, LRS was obligated to reimburse on a monthly invoiced basis only QTAT's payroll expenses. Anything beyond that, such as QTAT's deployment or overhead expenses, would be deducted when and if LRS realized net profits. According to LRS, QTAT cannot recover its deployment or overhead expenses because LRS never realized net profits.

LRS's interpretation of the Contract is not consistent with the agreement's terms. We "interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018) (internal quotation omitted). The Contract provides that "LRS shall pay QTAT for its reasonable and necessary invoices on a monthly basis" and that QTAT's invoices "shall be 'at cost,' and shall not include any profit margin for QTAT but shall include the actual necessary costs associated with QTAT hiring its employees for LRS projects." The jury reasonably could have found based on the Contract's plain language that QTAT and LRS agreed that LRS would pay QTAT's "reasonable and necessary invoices . . . 'at cost,'" which would include—but not be limited to—costs associated with

9

hiring employees, so long as those invoiced costs did not include a profit margin. Khan testified that the unreimbursed invoices represented QTAT's "actual costs." Because LRS does not point to evidence suggesting that the $821,108.53 included a profit margin, the evidence supports the jury's finding that LRS failed to pay QTAT's reasonable and necessary invoices, as required under the Contract. The $820,000 awarded by the jury is less than the total amount of unreimbursed invoices and thus falls within the range of damages presented at trial. *E.g.*, *MEMC Pasadena, Inc. v. Riddle Power, LLC*, 472 S.W.3d 379, 408 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("A jury thus has broad discretion to award damages within the range of evidence presented at trial.").

We overrule LRS's sole issue on appeal.

## QTAT's Appeal

### A. Fraud

In QTAT's first issue, it argues that the trial court erred in granting JNOV on the jury's fraud findings.

We review a trial court's ruling on a motion for JNOV under the same standard used for any motion that would render judgment as a matter of law. *See Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007) (citing *City of Keller*, 168 S.W.3d at 823). This standard requires that we credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* We view the evidence presented in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant. *City of Keller*, 168 S.W.3d at 824. To the extent that the trial court's ruling was based on a pure question of law, our review is de novo. *See In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994).

The jury found that LRS and Lee committed fraud. The jury was instructed:

Fraud occurs when:

1) A party makes a material misrepresentation, and

2) The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

3) The misrepresentation is made with the intention that it should be acted on by the other party, and

4) The other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means 1) a false statement of fact or 2) a promise of future performance made with an intent, at the time the promise was made, not to perform as promised or 3) a statement of opinion based on a false statement of fact or 4) a statement of opinion that the maker knows to be false or 5) an expression of opinion that is false, made by one who has, or purports to have, special knowledge of the subject matter of the opinion. "Special knowledge" means knowledge or information superior to that possessed by the other party and to which the other party did not have equal access.

QTAT argues that LRS and Lee made the following material misrepresentations, contained within the Contract:

- LRS would share 25% of net profits on invoices where QTAT did substantially all of the work.

- Lee's intent was to turn a profit as soon as possible.

- Lee/LRS intended to align LRS's interests with QTAT's interests.

QTAT contends that these statements are promises of future performance made without any intent to perform (example 2 in the jury instruction). *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). QTAT posits that these are not representations of LRS's

11

expected profitability—which would not be actionable[4]—but rather constitute actionable promises to *try* to be profitable. However, according to QTAT, LRS intentionally underpriced its services so that it would never turn a profit. Thus, QTAT continues, LRS did not even try to be profitable and the jury could infer that Lee had no present intent to perform the promise when he signed the Contract.

"A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). In analogizing the promises at issue in this case with other contractual promises found to be fraudulent, QTAT principally relies on *Chicago, Texas & Mexican Central Railway Co. v. Titterington*, 19 S.W. 472 (Tex. 1892), and *Luera v. Maynes*, No. 07-99-00325-CV, 2000 WL 1051895 (Tex. App.—Amarillo July 27, 2000, pet. denied) (not designated for publication). In *Titterington*, a railroad company contractually promised to build a depot on the plaintiff's land but then made no attempt to build the depot. *Titterington*, 19 S.W. at 472. In *Luera*, a mechanic agreed to repair the plaintiff's truck but then made no attempt to make any repairs. *Luera*, 2000 WL 1051895, at *1. In both cases, the lack of any effort to perform was probative evidence of fraud. *See Titterington*, 19 S.W. at 473; *Luera*, 2000 WL 1051895, at *2.

LRS argues that QTAT's cases are inapplicable and that we should look instead to "best efforts" cases. At oral argument, LRS pointed to a case from the Fifth Circuit, *Kevin M. Ehringer Enterprises, Inc. v. McData Services Corp.*, 646 F.3d 321 (5th Cir. 2011). In that case, the federal appeals court applied Texas law in analyzing whether a plaintiff could prevail on a fraudulent inducement claim

---

[4] *Fry v. Farm & Ranch Healthcare, Inc.*, No. 07-05-0221-CV, 2007 WL 4355055, at *3 (Tex. App.—Amarillo Dec. 13, 2007, no pet.) (mem. op.) ("Predictions and opinions regarding the future profitability of a business generally cannot form a basis for a claim of fraud.").

based on breach of a "best efforts" clause in a contract. *Id.* at 325-27. In conducting its analysis, the Fifth Circuit primarily relied on an opinion from the Dallas Court of Appeals, *CKB & Associates, Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577 (Tex. App.—Dallas 1991, writ denied) (op. on reh'g).

In *CKB*, CKB agreed to use its best efforts to refine Moore's crude oil into specific volumes of refined products, as set out in a schedule specifying percentages of total refinery output for each product. *Id.* at 578. However, instead of refining the crude oil to produce the quantities specified in the contract, CKB operated the refinery to produce the highest dollar yield on the crude. *Id.* at 579, 582. Moore sued for, and successfully moved for summary judgment on, breach of contract. *Id.* at 580. In affirming that CKB was liable, the appellate court noted that "[b]est efforts is a nebulous standard. Under some circumstances, a party could use best efforts to achieve a contractual goal and fall well short. Under different circumstances, an effort well short of one's best may suffice to hit a target." *Id.* at 581. Therefore, the *CKB* court determined that "to be enforceable, a best efforts contract must set some kind of goal or guideline against which best efforts may be measured." *Id.* If the contract sets out such goal or guideline, "[a] contracting party that performs within the guidelines fulfills the contract regardless of the quality of its efforts. When a party misses the guidelines, courts measure the quality of its efforts by circumstances of the case . . . and by comparing the party's performance with that of an average, prudent, comparable [party]." *Id.* at 582 (citations omitted). The court ultimately concluded that CKB breached the best efforts clause because it made *no* efforts to meet the production standards specified in the contract, stating: "As a matter of law, no efforts cannot be best efforts." *Id.*

Having surveyed the principles set forth in *CKB*, the Fifth Circuit concluded that the contractual "best efforts" provisions at issue in its case were too indefinite

13

to be enforceable. McData Services agreed to use its best efforts to "(i) further the promotion, marketing, licensing, and sale of [Ehringer's] Products; (ii) maintain an adequate inventory of sales literature; (iii) respond promptly to all inquiries from customers; (iv) permit Ehringer to visit McData's customers and to visit McData's place of business and inspect its relevant documents upon reasonable notice; and (v) participate and exploit Product capabilities at industry trade events." *McData Servs.*, 646 F.3d at 327. But there was no goal or guideline by which to measure performance. *Id.* Because the "best efforts" clause was too indefinite and vague to provide a basis for enforcement, the plaintiff's claim for fraudulent inducement could not rest on the alleged breach of that clause coupled with an alleged intent not to perform. *Id.* Just like the provisions at issue in *McData Services*, LRS argues that Lee's stated intent to realize a profit as soon as possible is too indefinite to be an enforceable promise.

Although we do not find *CKB*, *McData Services*, or other "best efforts" cases on-point, we agree with LRS's principal contention. A promise to "try to be profitable," which is how QTAT interprets the Contract, is too indefinite to be actionable as fraud. *See, e.g.*, *LaPree v. LaPree*, No. 03-20-00465-CV, 2022 WL 548285, at *5 (Tex. App.—Austin Feb. 24, 2022, no pet.) (mem. op.) (alleged promise that funds were "going to be community property" was not a definite promise of future action); *Cadle Co. v. Davis*, No. 04-09-00763-CV, 2010 WL 5545389, at *8 (Tex. App.—San Antonio Dec. 29, 2010, pet. denied) (mem. op.) (promise that parties would "get this behind us" too vague to support fraud); *CMS Energy Res. Mgmt. Co. v. Quicksilver Res., Inc.*, No. 02-07-00260-CV, 2009 WL 1815776, at *10 (Tex. App—Fort Worth June 25, 2009, no pet.) (mem. op.) ("We have reviewed the record extensively and we cannot locate, nor does Quicksilver point to, any specific promise or misrepresentation by CMS during the March 26

14

telephone conversation *that is definite enough*, that is specific enough, that is not conditional, and that is not mere trade talk so as to constitute an actionable misrepresentation to support a claim for fraudulent inducement.") (emphasis added).[5]

QTAT's cases are distinguishable and illustrate why the alleged promise here is unenforceable. In each case relied upon by QTAT, there was a definite promise—to build a depot or to repair a vehicle. *See Titterington*, 19 S.W. at 473; *Luera*, 2000 WL 1051895, at *2. Those are certain, ascertainable commitments to perform. We have no similar promise here. Lee did not promise in the Contract to make a profit, run LRS a certain way, price services at a certain threshold, or make any other definite promise on which QTAT could justifiably rely. *See, e.g.*, *Cadle*, 2010 WL 5545389, at *8 ("Promises must be specific and definite enough for it to be reasonable to rely upon them.").

Further, we are skeptical that Lee's statement—"It is my intent to realize a profit as soon as possible."—is a promise at all. Black's Law Dictionary defines promise as "[t]he manifestation of an intention to act or refrain from acting *in a specified manner*, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that the person will or will not do something." "Promise," Black's Law Dictionary (11th ed. 2019) (emphasis added). Again, Lee did not manifest an intention to act (or cause LRS to act) in a specified manner. This statement is not a commitment by LRS to make a profit.

Rather, Lee's statement is more akin to an opinion that he hopes LRS will be profitable, or an assertion of expectation that LRS would realize a profit "as soon

---

[5] For this reason, we consider LRS's "best efforts" cases inapplicable. Not only did Lee not promise to use best efforts to make LRS profitable, he did not make a definite promise at all. It is the purported promise itself that is too indefinite, not the lack of a goal or guideline by which to measure the promised performance.

as possible." Such statements are not actionable as fraud. *See Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995) (recognizing that "an expression of opinion about monetary value is not a representation of fact which gives rise to an action for fraud"); *Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 218-19 (Tex. App.—Austin 1999, pet. denied) (holding statements that an investment was "low risk" and would "produce large revenues for a long time" were merely dealers' talk); *see also CMS Energy*, 2009 WL 1815776, at *9-11 (statement that one party would "work towards the best use of the supply" of the other party's natural gas was, at most, a conditional, indefinite, speculative promise or mere trade talk and would not support an action for fraudulent inducement).

Lee's statement that "[i]t remains [his] intent to have QTAT's interests aligned with LRS" is similarly unactionable as fraud. QTAT principally relies on this statement as additional evidence that Lee fraudulently promised to try to be profitable.[6] As just explained, there is no merit to QTAT's position. But even if we considered Lee's statement regarding an alignment of interests as a separate promise, it too is not specific or definite enough to support a claim for fraud. *See, e.g.*, *Cadle*, 2010 WL 5545389, at *8.

In conclusion, there is no evidence that Lee or LRS made a material misrepresentation, specifically a definite promise to perform a certain act in the future with no present intent to perform. We therefore hold that the trial court did

---

[6] According to QTAT, Lee promised to align QTAT's and LRS's interests, which "meant that Lee and LRS would not be dissuaded from turning a profit based on any conflict of interest. *It also meant that Lee and LRS would operate in a way that maximized not only LRS's overall profits*, but particularly those profits allocable to QTAT's share of net profits by charging appropriate rates for QTAT's services, timely billing and collecting those charges, and deducting from revenues only those expenses actually necessary to LRS's and QTAT's joint work." (Emphasis added.)

16

not err in granting JNOV on QTAT's fraud claim, and we overrule QTAT's first issue.

## B.     Discovery and Summary-Judgment Rulings

QTAT's second issue is contingent upon our disposition of issue one. If we were to find that QTAT's fraud claim failed for legally insufficient evidence of damages, then QTAT argues in its second issue that the trial court reversibly erred in refusing to compel certain discovery relating to LRS's financial records. These records, according to QTAT, were necessary to prove its damages model "with precision." Because we disposed of QTAT's first issue on a different basis (i.e., no material misrepresentation rather than lack of damages), we need not address QTAT's second issue, and we overrule it as moot. *See* Tex. R. App. P. 47.1.

Similarly, QTAT's third issue is also rendered moot by our disposition of issue one. In its third issue, QTAT contends that the trial court erred in disposing of its conspiracy theory on summary judgment. In moving for summary judgment, the defendants argued, among other things, that an LLC cannot conspire with its members, citing *Bradford v. Vento*, 48 S.W.3d 749, 761 (Tex. 2001). On appeal, QTAT claims that an agent *can* conspire with its principal, if the agent stands to personally benefit, and that the trial court therefore erred in granting summary judgment on that ground. Agency principles notwithstanding, QTAT's conspiracy theory still fails for failure of an underlying tort. *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (civil conspiracy is not an independent tort but requires an underlying tort that has caused damages). QTAT's brief expressly and exclusively predicates its conspiracy theory on the underlying tort of fraud (allegedly committed by Lee and LRS), which we have already held to be unmeritorious. Accordingly, we need not address QTAT's third issue, and we overrule it as moot. *See* Tex. R. App. P. 47.1.

17

## C.    Leave to Amend Pleading

In its fourth issue, QTAT argues that the trial court erred in refusing to allow QTAT to amend its petition to add veil-piercing theories. We review the denial of a motion for leave to amend pleadings for abuse of discretion. *See Tex-Air Helicopters, Inc. v. Galveston Cty. Appraisal Review Bd.*, 76 S.W.3d 575, 581 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). A trial court abuses it discretion only when it makes a decision without reference to any guiding rules or principles. *Garcia v. Martinez*, 988 S.W.2d 219, 222 (Tex. 1999) (per curiam).

The trial court's docket control order set the pleading deadline for November 2, 2018. The court granted QTAT leave to file a third amended petition on November 14, 2018, and the third amended petition was filed November 29. On December 17, 2018, QTAT moved for leave to further amend its petition to add veil-piercing theories of alter ego and sham to perpetuate a fraud. Several defendants objected, arguing that the proposed amendment was unfairly prejudicial and surprising. After a hearing, the trial court denied leave.

The general rule regarding pleading amendments is that the parties may freely amend if the amended pleading is filed at least seven days before trial. *See* Tex. R. Civ. P. 63; *Sosa v. Cent. Power & Light*, 909 S.W.2d 893, 895 (Tex. 1995) (per curiam). Trial courts, however, have discretion to impose different pleading-amendment deadlines. *See* Tex. R. Civ. P. 166. Regardless whether the pleading-amendment deadline is that imposed by the general civil practice rule or by a docket-control or similar order, the principle governing late-filed pleading amendments is the same: "After the time for filing amended pleadings has passed, the trial court abuses its discretion in denying leave to file an amended pleading unless (1) the party opposing the amendment presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense, and thus

18

is prejudicial on its face, and the opposing party objects to the amendment." *In re Park Mem'l Condo. Ass'n*, No. 14-11-00818-CV, 2011 WL 4452834, at *1 (Tex. App.—Houston [14th Dist.] Sept. 27, 2011, orig. proceeding) (mem. op.).

An amended pleading is not prejudicial as a matter of law solely because it asserts a new cause of action. *See In re Estate of Parrimore*, No. 14-14-00820-CV, 2016 WL 750293, at *11 (Tex. App.—Houston [14th Dist.] Feb. 25, 2016, no pet.) (mem. op.) (citing *Tanglewood Homes Ass'n v. Feldman*, 436 S.W.3d 48, 64 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). An amendment is prejudicial on its face if: (a) it asserts a new substantive matter that reshapes the nature of the trial itself; (b) the opposing party could not have anticipated it in light of the development of the case up to the time the amendment was requested; and (c) the opposing party's presentation of its case would be detrimentally affected by the amendment. *See id.* (citing *Tanglewood Homes*, 436 S.W.3d at 64-65). To determine if the amendment is prejudicial on its face, we must evaluate it in the context of the entire case. *See id.*

Here, prior to the proposed amendment, QTAT had pleaded conspiracy and aiding and abetting but no other theories of derivative liability. In the amendment, QTAT sought to disregard LRS's corporate fiction to reach its members individually. The defendants objected, arguing that such theories were new matters that would reshape the nature of the upcoming trial, which was scheduled to commence in approximately two-and-a-half months. The defendants asserted that there was no overlap between the elements of the live claims and those necessary to prove alter ego or sham to perpetuate a fraud. The defendants also contended that they had already completed key discovery and to allow QTAT to amend its pleading would require further discovery, including additional depositions, thus delaying trial. Finally, the defendants pointed out that the trial

19

court had already granted QTAT leave to amend its petition after the pleading deadline passed, and if QTAT desired to allege new theories of derivative liability, it could have done so then.

The trial court agreed with the defendants, telling QTAT's counsel:

> Well, my concern is that now we're opening up a different facet of discovery, I think, that had not been previously contemplated or gone through. . . . But if you start going into alter ego and this kind of sham business theory, then you need to start going into their operations, how they're incorporated, how they worked, all that stuff, which, I think, opens up into a facet of discovery[.]

The court denied QTAT's motion a month after the hearing.

We conclude that QTAT has not demonstrated that the trial court abused its discretion in denying QTAT leave to amend its petition to add new theories of derivative liability. *See, e.g.*, *Flo Trend Sys., Inc. v. Allwaste, Inc.*, 948 S.W.2d 4, 7 (Tex. App.—Houston [14th Dist.] 1997, no writ) (no abuse of discretion to deny leave: "Allwaste argued at the hearing that this new theory of alleged liability would necessitate new witnesses, more depositions, new pleadings and it was a complete and prejudicial surprise that Allwaste could have avoided by pleading this theory earlier in the case. The trial court agreed with Allwaste . . . . ").

We overrule QTAT's fourth issue.

## D.     Evidentiary Ruling

QTAT argues in its fifth and final issue that the trial court erred by not allowing QTAT to present a specific factual theory to the jury. QTAT wanted to argue to the jury that LRS structured its business the way it did (i.e., allegedly underpricing services and not turning a profit) because LRS "was simply a mechanism of financing [Clark Love's and Lee Murphy's] expenses so that they could take on more cases" on the mass tort dockets and thus make more money.

The trial judge told QTAT, "At the end of the day, we're not going to get into how much money any of the law firms or anybody made off this [transvaginal mesh] docket." QTAT contends that the trial court abused its discretion "by giving Cross-Appellees the ability to repeatedly pose the rhetorical question 'why would anyone do this' while forbidding QTAT from providing an obvious answer."

QTAT's fifth issue is conditioned upon other relief. QTAT asserts that "[i]f the Court remands this case for additional proceedings, it should do so with the instruction that QTAT be allowed to discuss Cross-Appellees' back-end fees earned off of QTAT's work." Because we are not remanding the case on any ground, we overrule QTAT's fifth issue as moot. *See Tex Star Motors, Inc. v. Regal Fin. Co.*, 401 S.W.3d 190, 204 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

## Conclusion

We affirm the trial court's judgment.


/s/    Kevin Jewell
       Justice


Panel consists of Justices Jewell, Zimmerer, and Wilson. (Zimmerer, J., concurring)

21