**Opinion issued March 7, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00656-CV

————————————

**LINDA AND BARRY SPAIN AS TRUSTEES OF THE LINDA AND BARRY SPAIN TRUST, Appellants**

**V.**

**PHOENIX ELECTRIC, INC. AND HOUSTON METRO ELECTRICAL CORPORATION, Appellees**

On Appeal from the 129th District Court
Harris County, Texas
Trial Court Case No. 2021-53857

## MEMORANDUM OPINION

Appellants Linda and Barry Spain, as Trustees of the Linda and Barry Spain

Trust (collectively, "the Trustees"), sold their business, Houston Metro Electrical

Corporation ("HMEC"), to appellee Phoenix Electric, Inc. (collectively, "the Purchasers"). Following the sale, a dispute arose over the amount to be paid to the Trustees. The Trustees filed suit, alleging that the Purchasers failed to abide by their agreement to use "best efforts" in operating HMEC to procure qualifying new contracts, thereby maximizing the payments made to the Trustees pursuant to a contractual formula. The Purchasers moved for summary judgment, arguing that the best-efforts provision of the contract was vague and unenforceable. The trial court granted summary judgment in favor of the Purchasers and dismissed the Trustees' suit.

On appeal, the Trustees argue that (1) the trial court erred in granting summary judgment because the best-efforts provision is sufficiently definite to be enforceable; and (2) the trial court erred by failing to reconsider its summary judgment ruling. We affirm.

**Background**

Barry Spain founded HMEC, a company that performs electrical work for commercial and multifamily residential construction projects, over forty years ago. As part of his duties, Spain "manage[d] all projects, monitor[ed] and assist[ed] with marketing and sales efforts, supervise[d] accounting, purchasing, and field operations personnel, and [performed] other day-to-day tasks associated with

running the business." The Linda and Barry Spain Trust owned all the stock of HMEC.

In 2017, Phoenix Electric expressed interest in purchasing HMEC, and its representatives met with Spain. Spain and Phoenix Electric negotiated the sale over several months, and the parties executed a letter of intent in September 2017. The letter of intent contemplated that the parties would execute a purchase agreement to complete the sale of HMEC.

On May 31, 2018, Phoenix Electric and the Trustees, on behalf of the Linda and Barry Spain Trust, executed a Stock Purchase Agreement ("the Purchase Agreement"). Under the Purchase Agreement, the Trust agreed to sell its shares of HMEC's stock to Phoenix Electric for $500,000, which was due at closing on the Purchase Agreement. Phoenix Electric also agreed to pay to the Trust "75% of all accrued Accounts Receivable Retainage on the balance sheet as of the Closing Date" as HMEC collects such payments.[1]

Phoenix Electric also agreed to make "Earn-Out Payments" to the Trust, and it is these payments that form the basis for this appeal. This section of the Purchase Agreement provided:

---

[1]     The Purchase Agreement defined "Accounts Receivable Retainage" as "the retainage portion of any bid or contract entered into by [HMEC] for a job, typically 10% of the total cost of the bid or contract, used by customers as security to ensure complete performance by [HMEC] of the terms of the bid or contract and payable upon job completion."

3

2.5    Earn Out Payments.

(a)    Future Jobs. From and after the Closing, Purchaser [Phoenix Electric] shall pay to the Selling Shareholder [the Trust] (i) 85% of all Accounts Receivable Retainage from all contracts entered into by the Company [HMEC] or Purchaser for jobs within a 100-mile radius of downtown Houston during the 36 month period immediately subsequent to the Closing with 10% retainage, and (ii) 8.5% of Revenue for the balance of all contracts in progress as of the Closing Date and for all contracts entered into by the Company or Purchaser for jobs located within a 100-mile radius of downtown Houston during the 36 month period immediately subsequent to the Closing with less than 10% retainage (collectively, the "**Earn-Out Payments**") payable upon the earlier of (a) 120 days of job completion or (b) receipt by the Company or the Purchaser of all or any portion of the retainage.

(b)    Information to be Provided. The Company shall provide to Purchaser a schedule of all contracts in progress as of the Closing Date with less than 10% retainage. Purchaser shall provide the Selling Shareholder with monthly information on all contracts in progress as of the Closing Date and for all contracts subject to Earn-Out Payments (contracts for jobs located within the 100-mile radius of downtown Houston) entered into during the 36 month period immediately subsequent to the Closing, including the revenue and retainage amounts for each contract, and monthly collections information listed by jobs. Any cost savings or overruns from the adjusted estimated cost of all jobs in progress and at least 50% complete as of the Closing Date will be equally shared by Purchaser and the Selling Shareholder and Purchaser will provide substantiating documentation to Selling Shareholder to Selling Shareholder's reasonable satisfaction, as well as monthly financial statements for the Company (or otherwise reflecting the Houston operations). Purchaser shall also provide to the Selling Shareholder such other additional information as the Selling Shareholder may reasonably request to confirm and audit Earn-Out Payments, cost savings and overruns and other related amounts. Finalized savings and overruns shall be included and/or deducted from amounts otherwise payable pursuant to Section 2.5(a) hereof.

(c)    Approval Process. From and after the Closing, all contracts submitted by the Company must be approved by the Purchaser prior to submission to a customer, such approval to not be unreasonably

withheld. Any contract not approved by Purchaser will be reviewed with the Selling Shareholder.

(d)    Jobs Included/Territory. Any Revenue from a job site in the Houston area (defined as a 100 mile radius from downtown Houston, Texas) will be included in the Revenue and retainage for purposes of the Earn-Out Payments.

(e)    Purchaser Best Efforts. Purchaser shall use its best efforts in the operation of the Company's business from and after the Closing in a manner that maximizes the Earn-Out Payments to the Selling Shareholder, provided that Purchaser shall not be required to enter into any agreement that does not meet its historical profitability requirements.

(f)    Payment Rate Adjustment. Once the total consideration paid by the Purchaser to the Selling Shareholder for the Purchase Price hereunder exceeds $5 million, any remaining Earn-Out Payments shall be paid in accordance with the provisions of Section 2.5(a) except the percentages shall be reduced to 25% of Accounts Receivable Retainage or 2.5% of Revenue, as applicable.

In August 2021, the Trustees filed suit against the Purchasers and asserted a cause of action for breach of contract. The Trustees alleged that HMEC "obtains most of its work by submitting bids on projects with contractors" and that this process "often occurs months or years before the work on the project." By "build[ing] a backlog of future work," HMEC could "maximize productivity and revenue of its work crews," but it required "a team of people" to work in sales, marketing, and bid estimation to ensure adequate business.

The Trustees alleged that at the time Spain sought to retire in 2017, HMEC was worth around $4–5 million. During sale negotiations with Phoenix Electric, Phoenix Electric proposed that it make a down payment to purchase HMEC "plus a

5

three-year 'earn out' whereby the Trust would receive a portion of the revenue on HMEC's contracts in progress and new contracts closed during the three years after the sale, payable at the completion of each job." The Trustees alleged that, contrary to growing HMEC's business following the sale, the Purchasers did not maintain proper staffing levels at HMEC, and HMEC submitted far fewer bids on projects than it had in the year leading up to the sale. The Trustees alleged that the Purchasers breached the provision in the Purchase Agreement requiring them to use "best efforts" to maximize the Earn-Out Payments to the Trust. As a result of the Purchasers' breach of this provision, the Trustees allegedly "suffered damages in the form of lost Earn-Out Payments and the loss of the agreed-upon benefit of the bargain."

The Purchasers moved for traditional summary judgment. The Purchasers argued that to be enforceable, a best-efforts provision "must set some kind of goal or guideline against which best efforts may be measured." According to Purchasers, the contract provision requiring them to use best efforts to operate HMEC "in a manner that maximizes the Earn-Out Payments" was not an "objective goal or guideline" for measuring the Purchasers' performance. They argued that, as a result, the best-efforts provision was unenforceable.

In response, the Trustees argued that Texas law does not require a best-efforts provision to contain a specific "goal" or "guideline" to be enforceable. They argued

6

that, instead, when a best-efforts provision does not specify the performance that is required, the provision holds the promisor to the standard of what a reasonable person would do under the circumstances. The Trustees also argued that even if it were necessary for the clause itself to contain a goal or guideline, that requirement was satisfied because the contract required the Purchasers to operate HMEC in a manner that "maximizes the Earn-Out Payments."

Following a hearing, the trial court granted the Purchasers' motion for summary judgment and entered a take-nothing judgment against the Trustees. The Trustees moved for a new trial and for reconsideration of the trial court's summary judgment ruling, presenting additional summary judgment evidence and again arguing that the best-efforts provision was enforceable. The Trustees' motion for new trial was overruled by operation of law. This appeal followed.

## Analysis

In their first issue, the Trustees argue that the trial court erred in granting summary judgment in favor of the Purchasers because the best-efforts provision in the Purchase Agreement was not vague or unenforceable. In their second issue, the Trustees argue that the trial court erred by not reconsidering its summary judgment ruling.

### A. Standard of Review

We review a trial court's summary judgment ruling de novo. *Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 72 (Tex. 2023). A party moving for traditional summary judgment must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on the issues expressly set out in the motion. TEX. R. CIV. P. 166a(c). In reviewing a summary judgment ruling, we examine the evidence in the light most favorable to the non-moving party, indulging reasonable inferences and resolving doubts against the party seeking summary judgment. *Helena Chem. Co.*, 664 S.W.3d at 73.

When construing a contract, we look to the language of the parties' agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). Our goal is to give effect to the parties' intentions, as expressed in their agreement. *Id.* We should consider contractual provisions together and harmonize them, when possible, so that no provision will be rendered meaningless. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019) (quotations omitted). If we determine that we can give a contract's language certain or definite legal meaning, then the contract is not ambiguous, and we will construe the contract as a matter of law. *Barrow-Shaver Res.*, 590 S.W.3d at 479.

Whether a contract is enforceable is generally a question of law. *Turman v. POS Partners, LLC*, 541 S.W.3d 895, 905 (Tex. App.—Houston [14th Dist.] 2018,

8

no pet.); *El Expreso, Inc. v. Zendejas*, 193 S.W.3d 590, 594 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Chavez v. McNeely*, 287 S.W.3d 840, 843–44 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (stating that whether contract is sufficiently definite to be enforceable is legal issue "to be reviewed de novo by this Court"). Similarly, the interpretation of an unambiguous contract is a question of law that we review de novo. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018).

For a contract to be enforceable, it must "address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quotations omitted); *see Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 369 (Tex. 2019). An agreement's "essential terms" are those terms that parties would reasonably regard as "vitally important ingredients" of their bargain. *Fischer*, 479 S.W.3d at 237 (quotations omitted).

A contract must "at least be sufficiently definite to confirm that both parties actually intended to be contractually bound." *Id.* Even when the parties' intent to be bound is clear, the terms of the agreement must also be sufficiently definite to "enable a court to understand the parties' obligations" and "give an appropriate remedy if they are breached." *Id.* (quotations omitted). "A lack of definiteness in an agreement may concern the time of performance, the price to be paid, the work to be done, the service to be rendered or the property to be transferred." *Knowles v.*

9

*Wright*, 288 S.W.3d 136, 143 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (quotations omitted).

***B.*** ***Whether the Best-Efforts Provision in the Purchase Agreement is Enforceable***

The question before us is whether the contractual obligation for Phoenix Electric to use "its best efforts in the operation of [HMEC's] business from and after the Closing in a manner that maximizes the Earn-Out Payments to the Selling Shareholder" is sufficiently definite to be enforceable. The Trustees contend that this best-efforts provision "necessarily means that [the Purchasers] must use best efforts to operate HMEC in a manner that maximizes the number of new contracts" that HMEC procures in the future. The trial court found that this provision was unenforceable. The Trustees disagree.

**1.** **Courts Have Applied Differing Standards for Determining Whether Best-Efforts Clauses are Enforceable.**

The Texas Supreme Court has recognized that contractual "best efforts" clauses present a "multitude of thorny issues" regarding interpretation and enforceability. *Vizant Techs.*, 576 S.W.3d at 369 n.12. The term "best efforts" is "susceptible to a variety of interpretations," *see Citizens First National Bank of Tyler v. Cinco Exploration Co.*, 540 S.W.2d 292, 297 (Tex. 1976), and courts have reached inconsistent conclusions with respect to whether such contracts are enforceable. *Compare, e.g.*, *Kraftco Corp. v. Kolbus*, 274 N.E.2d 153, 156 (Ill. App. Ct. 1971)

10

("The mere allegation of best efforts is too indefinite and uncertain to be an enforceable standard."), *with Ashokan Water Servs., Inc. v. New Start, LLC*, 807 N.Y.S.2d 550, 553–54 (N.Y. Civ. Ct. 2006) (identifying multiple courts that "have applied an express 'best efforts' provision without articulated objective criteria, or implied one where it was not expressed"). Despite the "deeply unsettled" state of the law, parties "routinely include best efforts clauses in contracts." Rob Park, Comment, *Putting the "Best" in Best Efforts*, 73 U. CHI. L. REV. 705, 705 (2006); *cf.* Matthew (Hyung Kyun) Kwon, *Rise and Fall of Ordinary Course Covenants and Mae Clauses: Case and Trend Analysis*, 41 J.L. & COM. 199, 234 (2023) (noting recent trend of increasing use of qualifiers like "reasonable best efforts" and "commercially reasonable efforts" in merger agreements from 2005 to 2020) (citing Guhan Subramanian & Caley Petrucci, *Deals in the Time of Pandemic*, 121 COLUM. L. REV. 1405, 1463 (2021)); Zachary Miller, Note, *Best Efforts?: Differing Judicial Interpretations of a Familiar Term*, 48 ARIZ. L. REV. 615, 615 (2006) ("The judicial landscape is littered with conflicting interpretations of efforts clauses.").

The Texas Supreme Court has not ruled on the general enforceability of "best efforts" clauses in actions for breach of contract. *See Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 558–59 (5th Cir. 2002) (making *Erie* guess absent controlling Texas Supreme Court precedent); *W. Power, Inc. v. TransAmerican Power Prods., Inc.*, No. H-17-1028, 2018 WL 1697122, at \*3 (S.D. Tex. Apr. 6,

11

2018) (continuing to rely on Texas intermediate court authority absent controlling Texas Supreme Court holding).

The Trustees urge us to hold that the best-efforts clause is enforceable, and that a "best efforts" clause need not set out any specific goal or benchmark to be enforceable. For support, they cite to the Fort Worth Court of Appeals' statement that "[c]ourts construing a best efforts provision that does not specify the performance to be required commonly hold the promisor to the standard of the diligence a reasonable person would use under the circumstances." *DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 171 (Tex. App.—Fort Worth 2012, no pet.). According to the Trustees, best efforts is neither a "nebulous" nor "unworkable standard," as evidenced by the Texas Supreme Court's use of the term "best efforts" to explain a partner's obligation under a partnership agreement. *See Huffington v. Upchurch*, 532 S.W.2d 576, 579 (Tex. 1976) (establishing burden of proof to encourage best efforts of partner whose contract required partner to "give his attendance to, and to the utmost of his skill and power shall exert himself for, the joint interest, benefit and advantage of said partnership"). The Trustees also point out that the Uniform Commercial Code imposes a contractual best-efforts standard in at least one circumstance. *See* TEX. BUS. & COM. CODE § 2.306(b) ("A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best

efforts to supply the goods and by the buyer to use best efforts to promote their sale.").

The Trustees also urge us to follow cases from other jurisdictions that have enforced best-efforts provisions. For example, in *Bloor v. Falstaff Brewing Corp.*, the Second Circuit affirmed a judgment that a brewery breached a contractual clause requiring it to "use its best efforts to promote and maintain a high volume of sales . . . ." *See* 601 F.2d 609, 613 (2d Cir. 1979). Although enforceability of the clause was not at issue, the *Bloor* court noted that other New York cases suggested that "best efforts" clauses impose "an obligation to act with good faith in light of one's own capabilities." *See id.* at n.7; *see also Bloor v. Falstaff Brewing Corp.*, 454 F. Supp. 258, 266 (S.D.N.Y. 1978) ("'Best efforts' is a term which necessarily takes its meaning from the circumstances.") (quotations omitted), *aff'd*, 601 F.2d 609 (2d Cir. 1979). The Trustees also highlight *Conley v. Dan-Webforming International A/S (Ltd.)*, in which a federal court applied Delaware law to enforce a provision requiring the parties to "each use their best efforts to maximize the Sales in the Territory" and to "use their best efforts to cause [certain parties] to fulfill each of their obligations under this Agreement." *See* Civ. A. No. 91-401 MMS, 1992 WL 401628, at *19–20 (D. Del. Dec. 29, 1992). The court noted that "[t]he best efforts clause often insures the parties will do their best to accomplish the conditions necessary to complete the contract." *Id.* at *19.

By contrast, the Purchasers argue that a best-efforts clause is not enforceable unless it "set[s] some kind of goal or guideline against which best efforts may be measured." *See CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 581 (Tex. App.—Dallas 1991, writ denied) (op. on reh'g). This language comes from dicta in *CKB & Associates*, a breach-of-contract case involving a best-efforts provision. The suit arose following CKB's purchase of an oil refinery and subsequent agreement to refine approximately 15,000 barrels per day of sweet crude oil supplied by MMP into various refined products. *Id.* at 578. The contract required CKB to "use its best efforts to process the crude oil into the volumes of refined products reflected on Exhibit 'A,' with variations not to exceed plus or minus one percent (1%) from the volumes reflected on Exhibit 'A' for each product and from the total volume." *Id.* Exhibit A to the contract listed per-day targets for seven different petroleum products. *Id.* CKB also agreed to use its "best efforts" to help MMP market production of a particular type of jet fuel. *Id.* at 579. Although CKB processed MMP's oil, it did not do so in accordance with the targets listed in Exhibit A to the contract. *Id.* Specifically, CKB "significantly under-produced" the jet fuel. *Id.*

The enforceability of the best-efforts provisions in this contract was not at issue on appeal. However, in addressing whether the trial court could have found that CKB "failed to use its best efforts to produce within 1% tolerance the volumes

14

of refined products derived from Exhibit 'A,'" the Dallas Court of Appeals discussed some principles that have since become key to analyzing best-efforts provisions under Texas law. *Id.* at 581–82. The court stated:

> Best efforts is a nebulous standard. Under some circumstances, a party could use best efforts to achieve a contractual goal and fall well short. Under different circumstances, an effort well short of one's best may suffice to hit a target. Contracting parties ordinarily use best efforts language when they are uncertain about what can be achieved, given their limited resources. *Nonetheless, to be enforceable, a best efforts contract must set some kind of goal or guideline against which best efforts may be measured.* A contracting party that performs within the guidelines fulfills the contract regardless of the quality of its efforts. When a party misses the guidelines, courts measure the quality of its efforts by the circumstances of the case, and by comparing the party's performance with that of an average, prudent, comparable operator.

*Id.* (citations omitted) (emphasis added).

In concluding that no fact issue existed on whether CKB breached its obligation to use best efforts, the court stated, "As a matter of law, no efforts cannot be best efforts." *Id.* at 582. The Fifth Circuit, when making an *Erie* guess on the enforceability of best-efforts provisions under Texas law, has adopted the standard set out in *CKB & Associates. See Herrmann Holdings*, 302 F.3d at 558–60 (citing *CKB & Associates* and interpreting Texas law as requiring "some kind of goal or guideline" for best-efforts provision to be enforceable, but recognizing that contract need not set forth "a definite quantity" or "fix a date certain").

Both parties rely on the Fort Worth Court of Appeals' opinion in *DaimlerChrysler Motors Co. v. Manuel*. In that case, Chrysler had been attempting

15

to expand its share of the market in the Dallas-Fort Worth area, but it had a contentious relationship with Manuel, one of its existing dealers in the region. 362 S.W.3d at 166–68. Chrysler and Manuel entered into a franchise agreement allowing Manuel to open a new dealership in South Arlington and requiring him to open the new franchise by January 1, 2001. *Id.* at 168. The parties contemplated that other dealers in the region were likely to protest the opening of the new dealership, which would delay the opening due to mandatory regulatory proceedings that would be triggered by a protest. *Id.* Chrysler agreed that in the event of a protest against the new dealership, it would "use its best efforts to litigate or settle the protest or lawsuit in order to allow the establishment of [the South Arlington] dealership." *Id.*

Another dealer protested the creation of the new dealership, and it took nearly a year—from January 28, 2000, to December 21, 2000—before this protest was dismissed. *Id.* at 168–69. By the time Manuel could open the new dealership in February 2002, the automobile market was in "steep decline." *Id.* at 169.

In the ensuing litigation with Manuel, Chrysler argued that the best-efforts provision was "unenforceable because it lacks measurable goals and guidelines." *Id.* at 170. The Fort Worth Court noted that "courts enforce contractual best efforts clauses in a wide variety of circumstances" and that courts consider this standard to be "workable." *Id.* (quotations omitted). The court reviewed *CKB & Associates* and cases from other jurisdictions and stated, "Courts construing a best efforts provision

16

that does not specify the performance to be required commonly hold the promisor to the standard of the diligence a reasonable person would use under the circumstances." *Id.* at 171.

Chrysler argued that the best-efforts provision was unenforceable "because it fails to set forth a measurable goal or guideline in that no date was specified by which Chrysler was required to litigate or settle the [other dealer's] protest." *Id.* at 172. Manuel responded that, reading the contract as a whole, the contract required Chrysler to settle the protest in a manner that allowed Manuel to open the new dealership by January 1, 2001. *Id.* The Fort Worth Court agreed with Manuel and refused to interpret the best-efforts provision "as placing no deadline at all for Chrysler to litigate or settle" the protest because doing so would read the January 1, 2001 deadline out of the contract. *Id.* Instead, the "goal or objective" of the best-efforts provision, in light of the entire contract, was for Chrysler to use its best efforts to litigate or settle the protest "in such a period of time that Manuel could establish the South Arlington dealership by January 1, 2001." *Id.*

The court noted the "well-established rule" that when a contract does not fix a time for performance, "it will be presumed that the agreement is to be performed within a reasonable time," and what is a reasonable time depends upon the facts and circumstances at the time of contract formation. *Id.* at 173. Ultimately, the court concluded that the best-efforts provision "had a measurable timeline or goal of

17

resolving any protest by settlement or litigation within a reasonable time and was thus enforceable." *Id.*; *see also Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 326 (5th Cir. 2011) ("In interpreting *CKB & Associates*, we have held that the term 'goal' or 'guideline' need not be read narrowly."); *Herrmann Holdings*, 302 F.3d at 560 (stating that *CKB & Associates* "does not stand for the proposition that only goals which set forth a definite quantity are enforceable" and that requiring parties to "fix a date certain in order to set a temporal guideline in which to complete a certain task demands more definiteness than Texas law requires").

This Court has neither adopted nor rejected the standard articulated in *CKB & Associates*. We have acknowledged that "some cases hold that an agreement to use best efforts can be enforceable." *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 893 S.W.2d 92, 103 (Tex. App.—Houston [1st Dist.] 1994, writ denied). We have also noted, however, that "the words 'good faith effort' or 'best effort' are not talismanic," and the presence of these phrases in an agreement "does not automatically mean that the provision which contains them is enforceable." *Id.* at 103–04.

### 2. Application of Law to the Facts

Applying the law to the facts of this case, we hold that the Purchase Agreement provision at issue is unenforceable.

The Trustees and Phoenix Electric executed the Purchase Agreement to effectuate the sale of HMEC. The parties agreed that, as compensation under the agreement, the Trust would receive a $500,000 payment at closing, a percentage of "accrued Accounts Receivable Retainage on the balance sheet as of the Closing Date," and "Earn-Out Payments." With respect to Earn-Out Payments, the Purchase Agreement provided:

> 2.5    Earn Out Payments.
>
> (a)    Future Jobs. From and after the Closing, Purchaser [Phoenix Electric] shall pay to the Selling Shareholder [the Trust] (i) 85% of all Accounts Receivable Retainage from all contracts entered into by the Company [HMEC] or Purchaser for jobs within a 100-mile radius of downtown Houston during the 36 month period immediately subsequent to the Closing with 10% retainage, and (ii) 8.5% of Revenue for the balance of all contracts in progress as of the Closing Date and for all contracts entered into by the Company or Purchaser for jobs located within a 100-mile radius of downtown Houston during the 36 month period immediately subsequent to the Closing with less than 10% retainage (collectively, the "**Earn-Out Payments**") payable upon the earlier of (a) 120 days of job completion or (b) receipt by the Company or the Purchaser of all or any portion of the retainage.
>
> . . . .
>
> (c)    Approval Process. From and after the Closing, all contracts submitted by the Company must be approved by the Purchaser prior to submission to a customer, such approval to not be unreasonably withheld. Any contract not approved by Purchaser will be reviewed with the Selling Shareholder.
>
> . . . .
>
> (e)    Purchaser Best Efforts. Purchaser shall use its best efforts in the operation of the Company's business from and after the Closing in a manner that maximizes the Earn-Out Payments to the Selling Shareholder, provided that Purchaser shall not be required to enter into

any agreement that does not meet its historical profitability requirements.

(f)    Payment Rate Adjustment. Once the total consideration paid by the Purchaser to the Selling Shareholder for the Purchase Price hereunder exceeds $5 million, any remaining Earn-Out Payments shall be paid in accordance with the provisions of Section 2.5(a) except the percentages shall be reduced to 25% of Accounts Receivable Retainage or 2.5% of Revenue, as applicable.

We begin our analysis by agreeing with *CKB & Associates* that, while best-efforts clauses may be enforceable, the contract nevertheless must "set some kind of goal or guideline against which best efforts may be measured." *See* 809 S.W.2d at 581. The contract at issue here fails to do so. This is not a case like *Bloor* where the agreement was to use "best efforts" to achieve a measurable production goal. *See* 601 F.2d at 610 ("After the Closing Date the (Buyer) will use its best efforts to promote and maintain a high volume of sales under the Proprietary Rights."). Rather, this case is analogous to *Pinnacle Books, Inc. v. Harlequin Enterprises Ltd.*, a case decided under New York law that acknowledged *Bloor* but nonetheless found a best-efforts provision to be unenforceable. *See* 519 F. Supp. 118, 121–22 (S.D.N.Y. 1981), *aff'd*, 661 F.2d 910 (2d Cir. 1981).

In *Pinnacle Books*, the court considered an enforceability challenge to a "best efforts" clause by which a publisher agreed to publish ten books in a particular series. *Id.* at 120. If, after extending their best efforts, the parties could not reach an agreement on the terms of a new contract for the series, the author would be free to

20

offer rights in the other books in the series to any other publisher. *Id.* Applying New York law, the court concluded that "the 'best efforts' clause is unenforceable because its terms are too vague." *Id.* at 121. The court explained that "[e]ssential to the enforcement of a 'best efforts' clause is a clear set of guidelines against which the parties' 'best efforts' may be measured." *Id.*

The problem in *Pinnacle Books* was that "[u]nless the parties delineate in the contract objective standards by which their efforts are to be measured, the very nature of contract negotiations renders it impossible to determine whether the parties have used their 'best' efforts to reach a new agreement." *Id.* at 122. In so holding, the court distinguished this scenario from enforceable best-efforts agreements to work toward a stated goal, as in *Bloor*. *Id.* at 121–22. New York state courts have held similarly. *See Bernstein v. Felske*, 533 N.Y.S.2d 538, 540 (N.Y. App. Div. 1988) (stating that even if letter of intent contained implied promise to use good faith efforts to negotiate toward future deal, agreement was unenforceable because it lacked "a clear set of guidelines against which" party's best efforts could be measured); *Mocca Lounge, Inc. v. Misak*, 462 N.Y.S.2d 704, 706–07 (N.Y. App. Div. 1983) ("[A] clear set of guidelines against which to measure a party's best efforts is essential to the enforcement of such a clause.").

As in *Pinnacle Books*, the contract at issue here lacks a clear set of guidelines against which Phoenix Electric's best efforts can be measured. The Purchase

21

Agreement does not specify *how* Phoenix Electric is to maximize Earn-Out Payments to the Trustees, for example, by requiring Phoenix Electric to bid on as many new contracts as possible or by requiring Phoenix Electric to prioritize more lucrative new contracts that would yield a higher amount of retainage. The only parameters were that the Purchasers need not enter a new agreement that does not meet "historical profitability requirements." This is not enough to go on to determine whether the Purchasers used their best efforts to procure new contracts that would qualify for Earn-Out payments.

This absence of parameters for performance makes this agreement similar to other agreements that we have found to be unenforceable in prior cases. In *Knowles v. Wright*, we addressed whether an alleged oral contract for one party to use "his best effort" to "build a business enterprise" was sufficiently definite to be enforceable. 288 S.W.3d at 143–46. Knowles, a landman, alleged that he and Wright orally agreed to "build a business focused on the Barnett Shale." *Id.* at 139. Knowles further alleged that he would provide consulting services to acquire oil and gas leases, and in exchange, he would receive 50% of Wright's interest in the business after Wright had recovered his costs. *Id.* After Wright allegedly offered Knowles "far less" than the number of shares Knowles believed he was owed, Knowles sued Wright for several claims, including breach of contract. *Id.* Wright moved for summary judgment, arguing that Knowles' breach of contract claim was barred

because the alleged oral contract was not sufficiently definite to be enforceable. *Id.* at 140.

During Knowles' deposition, he was asked what the alleged oral contract required him to do. *Id.* at 143. Knowles "explained that he had promised Wright all of his 'best effort' and 'everything else, such as [his] blood, sweat, tears and anything else [he] could come up with to get it done, avoiding any and all other opportunities." *Id.* Knowles was also asked "exactly what he was to direct his best efforts toward," and Knowles responded, "Build a business enterprise of which [he] would share half of." *Id.*

In concluding that no enforceable oral contract existed, we reasoned that Knowles "offered no testimony as to what specific services the oral contract actually *required* of him." *Id.* We stated:

> The bottom line is that Knowles did not offer evidence as to what exactly he was obligated to do and what specific services he was required to provide under this subsequent oral contract to build a business with Wright—terms essential to the parties' purported oral contract to build a business and ultimately sell the shares of that business for profit.

*Id.* at 144. We concluded that the "lack of definiteness" concerning the work to be done and the services that Knowles was to perform under the alleged oral agreement was fatal to Knowles' breach of contract claim. *Id.* We further stated that Knowles could not establish the existence of an oral contract "simply by detailing the consulting services that he actually provided during the parties' business

23

relationship." *Id.* Additionally, we noted that while a contract would not need to specify the "day-to-day duties" of Knowles and Wright, who were both experienced in the oil and gas industry and had knowledge of the role of a landman, the agreement needed to provide terms relating to Knowles' "specific obligations, i.e., exactly what was required of Knowles so that Wright could enforce the contract against Knowles." *Id.* "Without evidence of the performance specifically required under an oral or written contract, a court simply cannot fix the legal obligations and liabilities of the parties." *Id.* at 145.

This same lack of definiteness plagued the agreement in *Chavez v. McNeely*, a case that involved enforcement of a contract incident to a divorce decree. *See* 287 S.W.3d at 845–47. In that case, an agreed divorce decree contained a provision stating that the husband's sister would be responsible for the daily physical care of the husband, who had been paralyzed in a horseback riding accident. *Id.* at 842. The wife stipulated that she "will provide as much toward the care and providing for the needs of [the husband] as possible, limited only by her personal financial situation." *Id.* The husband later filed a breach of contract claim against the wife, and the wife argued that the provision in the divorce decree that served as the basis for this claim was too indefinite to be enforceable. *Id.* at 843.

On appeal the wife argued that the provision contained three indefinite terms: (1) the provision did not define "as much as possible" or "explain how the parties

24

will reach an agreement as to what that term means"; (2) the provision did not specify what the husband's "needs" were; and (3) the provision did not explain "how or when" the wife's "'personal financial situation' would be impacted such that it would excuse or reduce any performance required by her." *Id.* at 846. We agreed with the wife. *Id.* at 846–47. We stated that the wife's attempts to comply with the provision "for some time" did "nothing to clarify the clause in question." *Id.* The provision included "simply no guidance" to tell the wife "or the court how much [the wife] is required to pay each month or how and when her personal financial situation would be such that it would reduce or excuse her performance." *Id.* at 847. We concluded that the provision was too indefinite to be enforced as a contract. *Id.*

We therefore conclude that the best-efforts provision of the Purchase Agreement is unenforceable. We hold that the trial court did not err by granting summary judgment in favor of the Purchasers.

We overrule the Trustees' first issue.

## C.     *Whether the Trial Court Erred by Failing to Grant the Trustees' Motion for Reconsideration*

In their second issue, the Trustees argue that the trial court erred by failing to grant their motion for reconsideration and for new trial. After the trial court granted the Purchasers' summary judgment motion, the Trustees sought reconsideration of this decision and attached additional evidence, including a new declaration from Spain addressing the differences in HMEC's business operations before and after

the sale of the company and drafts of the Purchase Agreement reflecting that both the Trustees and Phoenix Electric had input into the language of the best-efforts provision. This motion was overruled by operation of law.

The Trustees argue that evidence relating to the negotiation of the best-efforts provision—specifically, Phoenix Electric's addition of language that it "shall not be required to enter into any agreement that does not meet its historical profitability requirements"—indicates that Phoenix Electric understood the meaning of the provision and what was required of it under the provision. However, the inquiry is not whether the parties to the contract subjectively understand what performance is required of them but whether the terms of the contract are sufficiently definite to "enable a court to understand the parties' obligations" and "give an appropriate remedy if they are breached." *See Fischer*, 479 S.W.3d at 237 (quotations omitted); *see also Knowles*, 288 S.W.3d at 145 ("Without evidence of the performance specifically required under an oral or written contract, a court simply cannot fix the legal obligations and liabilities of the parties."); *Chavez*, 287 S.W.3d at 846–47 (stating that wife's "attempt to comply with the indefinite term for some time does nothing to clarify the clause in question" because clause itself provides "simply no guidance" to tell wife or court how much she must pay per month or how her financial situation might excuse future performance).

The language of the best-efforts provision itself does not provide a goal or guideline against which a court can measure whether Phoenix Electric used its best efforts to maximize Earn-Out Payments to the Trustees. The evidence submitted by the Trustees in their motion for reconsideration does not change this conclusion. We therefore hold that the trial court did not err by failing to grant the Trustees' motion for reconsideration.

We overrule the Trustees' second issue.

## Conclusion

We affirm the trial court's summary judgment in favor of the Purchasers, Phoenix Electric and Houston Metro Electrical Corporation.


April L. Farris
Justice

Panel consists of Justices Kelly, Landau, and Farris.